[Civ. No. 26156. Second Dist., Div. One. Oct. 9, 1962.]

D. W. MERCER, Cross-Complainant and Appellant, v. AMOS W. ELLIOTT et al., Cross-Defendant and Respondent.

Older, Cazier, Preston & Hoegh and Charles H. Older for Cross-complainant and Appellant.

Fain & Lavine and Richard A. Lavine for Cross-defendant and Respondent.

FOURT, J.—This is an appeal by the cross-complainant (hereinafter referred to as "Mercer") from a judgment of dismissal after the trial court sustained, without leave to amend, cross-defendant's (hereinafter referred to as Elliott) demurrer to the third count of the *fourth amended cross-complaint*. The judgment dismissed the third count and Elliott from the action and awarded costs to Elliott. The demurrer was sustained on the grounds that the third count failed to state facts sufficient to constitute a cause of action, and that it appeared to be barred by Code of Civil Procedure section 338, subdivision 4 (three-year statute of limitations).

The allegations of the third count of the fourth amended cross-complaint are set forth in pertinent part in footnote one.[1]

In addition to the items set forth in paragraph XXIII (a) through (e), Mercer prayed for "interest on the above amounts at the legal rate" and for "costs of suit and for such other and further relief as to the Court seems just."

Mercer's first contention is that a cause of action for fraud and deceit is alleged. This aspect of the appeal will be discussed without regard to the possible application of the statute of limitation.

The rules relating to the trial court's determination of a demurrer on the ground that a pleading does not state facts sufficient to constitute a cause of action and which govern a reviewing court in considering an appeal from a judgment entered on the sustaining of a demurrer on that ground are in

[1] See footnotes 1 to 5 at end of opinion.

278

general as follows: The allegations of the complaint must be regarded as true. It is assumed that plaintiff can prove all the facts as alleged; defects in the pleading which do not affect the substantial rights of the parties are disregarded; pleadings must be reasonably interpreted; they must be read as a whole and each part must be given the meaning that it derives from the context wherein it appears; the allegations must be liberally construed with a view to substantial justice between the parties and that the administration of justice shall not be embarrassed by technicalities or useless forms. (*Hill* v. *City of Santa Barbara,* 196 Cal.App.2d 580, 585 [16 Cal.Rptr. 686].)

 The complaint (i.e. cross-complaint in the case at bar but hereinafter sometimes referred to as "complaint") in an action founded on false representations must allege facts showing the following elements of the cause of action: *first,* representations of material facts by defendant; *second,* the representations were not true; *third,* defendant either did not believe them to be true, or knew them to be false, at the time they were made; *fourth,* defendant intended to induce action or conduct by the plaintiff; *fifth,* plaintiff justifiably acted in reliance upon the representations; and *sixth,* plaintiff sustained damage as a proximate result thereof. (*Gagne* v. *Bertran,* 43 Cal.2d 481, 487 [275 P.2d 15].) It therefore follows that the absence from the complaint of any one of the six essential elements renders it defective and insufficient to state a cause of action. (*Gonsalves* v. *Hodgson,* 38 Cal.2d 91, 100-101 [237 P.2d 656].)

 Testing the complaint in light of the above set forth principles, the first question is whether Mercer has made factual allegations showing that he in fact acted in reliance upon the representations, and that under the circumstances his reliance was reasonable and prudent. Mercer does allege reliance upon Elliott's representation in paragraph IX.

Elliott (*i.e.,* respondent) contends that Mercer's inspection of the aircraft on August 1, 1957 (paragraph XI, cross-complaint) negates reliance on facts pertaining to the condition of the aircraft that are inconsistent with the opportunity that he had to inspect the aircraft for himself and to rely on what he or his agents did or could have discovered—that where a person having the opportunity to do so undertakes an inspection of obvious conditions such as the condition of an aircraft, such person is chargeable with such information and knowledge as would ordinarily flow from such inspection,

and such person cannot claim reliance upon mere representations alone.

In paragraph XI Mercer does allege that he made "a cursory inspection of the exterior of the aircraft . . . on or about July 5, 1957, *for the purpose of detecting any damage to the exterior of the aircraft prior to the flight of the aircraft from El Paso to Burbank, California. . . .*" (Emphasis added.) This "cursory inspection" was made subsequent to the time that Mercer paid the $5,000 for the option to purchase (June 12, 1957—paragraph VI) but prior to the date of purchase (July 6, 1957—paragraph VIII) and prior to the date that Mercer entered into an oral lease agreement with cross-defendants Tuttle, Koenen, and Aviation Finance (July 26, 1957—paragraph IX).

It is only where a party to whom a representation is made has the means at hand for determining its truth or falsehood and resorts to such means, without interference by the other party, and after investigation learns that the statement was false, that he is precluded from asserting that he relied upon the representation. The rationale for this is that the investigation and ascertainment of the facts exclude the idea that any reliance was placed upon the falsehood. (*Harper* v. *Silver,* 200 Cal.App.2d 103 [19 Cal.Rptr. 78] ; *Blackman* v. *Howes,* 82 Cal.App.2d 275, 279 [185 P.2d 1019, 174 A.L.R. 1004].)

Since the allegations of the complaint must be regarded as true (*Hill* v. *City of Santa Barbara, supra,* 196 Cal.App.2d 580 [16 Cal.Rptr. 686]) the pleading shows that Mercer did not discover the true condition of the aircraft until August 1, 1957 (paragraph XI) and therefore was justified in relying upon the representations made by Elliott.

Mercer's action for fraud is not predicated upon the representations concerning the condition of the aircraft. The alleged fraud which serves as the basis for this action consists of the representations by Elliott that the aircraft "as modified had been approved for commercial aviation operations by the F.A.A., and that . . . Elliott had all of the aircraft records . . . to substantiate the fact that said modifications had been made, and that said modifications had been approved by the F.A.A. Cross-defendant Elliott further represented that said aircraft records would be delivered to the buyer with the aircraft; (c) that all said aircraft required in order to obtain a certificate of airworthiness for commercial flight operations from

the F.A.A. was an 8,000 hour airframe inspection." (Paragraph VII.)

Elliott asserts that his representation that "all said aircraft required in order to obtain a certificate of airworthiness for commercial flight operations from the F.A.A. was an 8,000 hour airframe inspection" is merely a "statement of nonactionable opinion, for which respondent may not be charged as liable in an action for fraud and deceit." Elliott further asserts that Mercer may not justifiably rely upon such expression of opinion.

The line between opinion and fact is not a distinct one; hence if the opinion is rendered under circumstances such that it may be regarded as amounting to a positive affirmation of fact, it will be treated as a representation of fact for purposes of a deceit action. (See *Gilbert* v. *Corlett*, 171 Cal.App. 2d 116 [339 P.2d 960] ; *Clar* v. *Board of Trade*, 164 Cal.App. 2d 636 [331 P.2d 89] ; *Pearson* v. *Allen*, 150 Cal.App.2d 638 [310 P.2d 688] ; *Friedberg* v. *Weissbuch*, 135 Cal.App.2d 750 [287 P.2d 785].) In any event it is clear that Elliott's representations to the effect that the modifications made to the aircraft had been approved for commercial aviation operations by the F.A.A., and that he had all the records to substantiate the fact that the modifications had been made and that they had been approved, constituted representations of fact. The falsity of the representations is set forth in paragraph X of the complaint.

An examination of Mercer's cross-complaint discloses that he has stated facts sufficient to constitute a cause of action.

Mercer's next contention is that the action is not barred by the statute of limitations.

An action for relief on the ground of fraud or mistake must be brought within three years. "The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." (Code Civ. Proc., § 338, subd. 4.)

The allegations set forth in paragraph XI of the cross-complaint show that a few days after August 1, 1957, Mercer discovered for the first time that the aircraft did not require an 8,000-hour airframe inspection as represented by Elliott; that the prior modifications to the aircraft had not been approved by the F.A.A.; and that the F.A.A. at Burbank refused to issue a certificate of airworthiness for the aircraft until such time as the aircraft records relating to the prior modifications, including the detailed engineering drawings

and specifications relating thereto, were furnished to it, and the design, type and quality of the modifications were approved by the F.A.A. at Burbank.

Mercer first filed his first amended cross-complaint against Elliott on or about February 9, 1961, more than three years after discovery of the above facts. This serves as the basis for Elliott's contention that the action is barred by the statute of limitations.

Mercer has attempted to circumvent the bar of the statute of limitations by urging that there is a distinction between his discovery in August 1957 of the fact that the aircraft could not be certified until certain records were furnished to the F.A.A. and that these records were missing, and Mercer's discovery in October 1958 that Elliott's continuing representations that he (Elliott) would provide the necessary records were false.

It is stated in *Regus* v. *Schartkoff*, 156 Cal.App.2d 382 [319 P.2d 721] at pages 386-387 in pertinent part as follows:

"[1] The equitable doctrine of estoppel *in pais* is applicable in a proper case to prevent a fraudulent or inequitable resort to the statute of limitations. [2] A person by his conduct may be estopped to rely on the statute. [3] Where the delay in commencing an action is induced by the conduct of the defendant, it cannot be availed of by him as a defense. One cannot justly or equitably lull his adversary into a false sense of security and thereby cause him to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his conduct as a defense to the action when brought."

The facts alleged in the cross-complaint disclose that Elliott continued to represent that he would provide the necessary records; that in reliance on said representations Mercer performed extensive repair and maintenance work on the aircraft (paragraph XIII); that during the latter part of 1957 and to and including October 1958 Elliott furnished or caused to be furnished to Mercer or to the F.A.A. certain information and drawings relating to the prior modifications; but that the information so furnished was inadequate to describe the nature, type and extent of the prior modifications and any prior approval by the F.A.A. (paragraph XV); that upon each refusal of the F.A.A. to certificate the aircraft, Elliott further represented that the records necessary to obtain a certificate were in existence (paragraph XVI); that Elliott

misrepresented such facts for the purpose of inducing Mercer to rely thereon and to lull Mercer into believing that Elliott in fact could and would obtain the aircraft records required for the certification of the aircraft (paragraph XXI).

Viewing the cross-complaint as a whole, and assuming all facts stated therein as true, we believe that Mercer has asserted sufficient facts to negative the application of the statute of limitations and therefore we hold that the trial court erred in sustaining a demurrer on that ground.

There is nothing to prevent Elliott from again raising the defense in his answer to the cross-complaint and from having a separate trial of the special defense before the trial of any other issue in the case. (Code Civ. Proc., § 597.)

For the reasons stated, the judgment is reversed.

Wood, P. J., and Lillie, J., concurred.

---

[1] "Third Cause of Action Solely Against Cross-defendant Amos W. Elliott

"I

" . . . . . . . . . .

"II

" . . . . . . . . . .

"III

"Between January 1, 1957 and July 5, 1957 . . . Elliott was the owner of a . . . Doublas [sic] DC-3 aircraft . . . which said aircraft was located in Detroit, Michigan.

"IV

"At all times mentioned herein . . . [Mercer] was engaged in the business of operating aircraft used by . . . [Mercer] in various commercial aviation activities, including the transportation of persons and property for hire, all of which was known to . . . Elliott.

"V

"Prior to July 5, 1957 . . . Elliott orally offered to sell said aircraft to . . . [Mercer] or to cross-defendants Tuttle, Koenen, and Aviation Finance. On or about June 1, 1957 . . . [Mercer] informed . . . Elliott that . . . [Mercer] was financially unable to purchase said aircraft, but that cross-defendants Tuttle, Koenen, and Aviation Finance would purchase the aircraft from . . . Elliott providing that . . . [Mercer] agreed in advance of such purchase to lease said aircraft from cross-defendants Tuttle, Koenen, and Aviation Finance following such purchase.

"VI

"On or about June 12, 1957 . . . [Mercer] paid to . . . Elliott the amount of $5,000.00 for a written option to purchase said aircraft. Cross-complainant [i.e. Mercer] obtained said option for the purpose of allowing cross-defendants Tuttle, Koenen, and Aviation Finance to purchase said aircraft and lease it to . . . [Mercer] as alleged above in this paragraph.

"VII

"With the intention and for the purpose of inducing . . . [Mercer] to lease said aircraft from cross-defendants Tuttle, Koenen, and Aviation Finance, in order that . . . Elliott could consummate the sale of said aircraft to cross-defendants Tuttle, Koenen, and Aviation Finance . . . Elliott orally represented to . . . [Mercer] and cross-defendants Tuttle, Koenen, and Aviation Finance the following:

"(a) That said aircraft was complete and ready for commercial air operations except for two aircraft engines, which . . . Elliott further represented were available as part of the transaction at a price of $250.00 each, and that each of said engines had been operated approximately 800 hours since last overhaul;

"(b) That certain modifications, consisting of a conversion of the aircraft to a 'challenger 250' configuration, the exact nature of which is unknown to . . . [Mercer], had been made to the wings, wing tips, wing fillets, pitot tubes, rudder, and wheel door enclosures, which would enhance the value of said aircraft and increase its performance. That said aircraft as modified had been approved for commercial aviation operations by the F.A.A., and that . . . Elliott had all of the aircraft records, including engineering drawings and specifications, pertaining to said modifications to substantiate the fact that said modifications had been made, and that said modifications had been approved by the F.A.A. Cross-defendant Elliott further represented that said aircraft records would be delivered to the buyer with the aircraft;

"(c) That all said aircraft required in order to obtain a certificate of airworthiness for commercial flight operations from the F.A.A. was an 8,000 hour airframe inspection. That except for the necessity of performing said inspection in order to obtain said airworthiness certificate, said aircraft was airworthy and in condition to be licensed to perform commercial air operations under the applicable requirements of the F.A.A.

"VIII

"Cross-defendants Tuttle, Koene, and Aviation Finance purchased said aircraft from . . . Elliott on or about July 6, 1957, for a purchase price of $85,000.00, and the amount of $5,000.00 paid by . . . [Mercer] to . . . Elliott for said option referred to hereinabove was credited against the purchase price of said aircraft by . . . Elliott.

"IX

". . . [Mercer] relied on each and all of said representations made by . . Elliott and was induced thereby to enter into an oral agreement for the lease of said aircraft, with an option to purchase, with cross-defendants Tuttle, Koenen, and Aviation Finance on or about June 1, 1957, and to enter into a written lease and option agreement with cross-defendants Tuttle, Koenen, and Aviation Finance on or about July 26, 1957. Prior to entering into said oral lease of said aircraft with said cross-defendants . . . [Mercer] was informed by said cross-defendants that they would purchase said aircraft from . . . Elliott only if . . . [Mercer] agreed in advance to lease said aircraft from cross-defendants Tuttle, Koenen, and Aviation Finance following its purchase.

"X

"Each of said representations made by . . . Elliott to . . . [Mercer] was false and fraudulent and said representations were known by . . . Elliott to be false and fraudulent when made by him to . . . [Mercer]. In truth and in fact:

"(a) Said aircraft was not airworthy in the following respects: No certificate of airworthiness had been issued by the F.A.A., and the aircraft was not equipped or in condition to be operated in commercial

flight operations. The aircraft required the installation of wing-attach doublers, an engine fire prevention and detection system, an electrical system, radio wiring and radio equipment, a pilot's seat, a complete interior, a cabin heating system including air ducts, a lavatory, passenger seats and seat tiedown fittings, modifications of fire detection and shut-off systems, recovering of the elevators, replacement of the front bulkhead, inspection and replacement or overhaul of all flight and engine instruments, repair of windshield wipers, installation of seat-belt and no smoking signs, installation of F.A.A. approved escape hatch release handles, and emergency exit markings and exit lights. In addition, the propellers, wing-tips, pitot system, rudder tab system, and engine exhaust stack system had not been certificated as airworthy by the F.A.A.

"(b) Said aircraft was not complete and fully equipped for commercial flight operations when delivered to . . . [Mercer]. In order to place said aircraft in condition for commercial flight operations . . . [Mercer] was required to and did perform the following work on said aircraft following the delivery of said aircraft to . . . [Mercer]: Installation of new radio wiring, junction boxes, and circuit breaker boxes; fabrication and installation of radio racks; installation of cannon plugs and other fittings to accommodate radio equipment; installation of new aircraft wiring; installation of new circuit breaker system; installation of fire detection and prevention system; the aircraft interior and exterior was thoroughly cleaned; the elevators were removed, repaired, and recovered; control surfaces were rejuvenated and re-silvered; the empennage was dismantled for inspection and was re-chromated; the luggage compartment was cleaned and re-chromated; temporary passenger seats were removed; control cable pulleys were greased and treated with preservatives; control cable fittings were chromated; a forward bulkhead was installed in the cabin; the nose section was opened, inspected and chromated; the landing gear was inspected and a gear retraction test was performed; the landing gear wheel doors were removed, replaced and adjusted; the aircraft skin was cleaned on four separate occasions with acid brightener; the aircraft was washed with detergent soap approximately every six weeks; the aircraft engines were turned over to prevent corrosion at least every two to three weeks; the aircraft engines were started and operated on the ground every thirty to forty-five days; all aircraft inspection holes were opened and the wing fillets were removed; a complete visual inspection was made of the aircraft, including wing-attach angles and wing fuel tanks; and an inspection of the complete aircraft was made for the purpose of detecting corrosion.

"(c) The prior modifications to said aircraft, referred to in paragraph VII(b), above, had not been approved by the F.A.A., and the F.A.A. would not issue a certificate of airworthiness for said aircraft for commercial flight operations until the aircraft records, including engineering drawings and specifications, pertaining to said modifications were made available to representatives of the F.A.A. at Burbank, California, and the design, type and quality of the modifications made to said aircraft were approved by the F.A.A. at Burbank, California. Cross-defendant Elliott failed to deliver either to . . . [Mercer] or cross-defendants Tuttle, Koenen, or Aviation Finance the aircraft records showing said prior modifications to said aircraft and their approval by the F.A.A. as represented by . . . Elliott, and as a result . . . [Mercer] has been unable to obtain a certificate of airworthiness for said aircraft from the F.A.A., and has been unable to use the aircraft in his air transportation business.

"XI

"Neither . . . [Mercer] nor any agent or employee of . . . [Mercer] inspected said aircraft or acquired any information concerning its actual

condition or the actual condition and extent of the aircraft records furnished by . . . Elliott, until on or about August 1, 1957, except for a cursory inspection of the exterior of the aircraft made by . . . [Mercer] at El Paso, Texas, on or about July 5, 1957, for the purpose of detecting any damage to the exterior of the aircraft prior to the flight of the aircraft from El Paso to Burbank, California, on or about July 5, 1957. On or about August 1, 1957 . . . [Mercer] caused an inspection of the aircraft, and the aircraft records furnished to . . . [Mercer] by . . . Elliott, to be made for the purpose of performing an 8,000 hour airframe inspection on the aircraft and obtaining a certificate of airworthiness. As a result of said inspection, together with discussions with F.A.A. representatives in Burbank, California, a few days thereafter . . . [Mercer] discovered for the first time that the aircraft did not require an 8,000 hour airframe inspection as represented by . . . Elliott, that the F.A.A. would not issue a certificate of airworthiness upon the performance of such an inspection, but on the contrary that the prior modifications to the aircraft referred to in paragraph VII(b), above, had not been approved by the F.A.A. and could not be approved, nor could a certificate of airworthiness for the aircraft be issued, until the aircraft records pertaining to said modifications were made available to, and the design, type and quality of the modifications made to the aircraft by . . . Elliott were approved by, the F.A.A. at Burbank, California. The F.A.A. at Burbank refused to issue a certificate of airworthiness for the aircraft until such time as the aircraft records relating to said prior modifications, including the detailed engineering drawings and specifications relating thereto, were furnished to it, and the design, type and quality of the modifications were approved by the F.A.A. at Burbank. Although . . . [Mercer] examined the aircraft, the applicable regulations and requirements of the F.A.A. concerning the issuance of a certificate of airworthiness for the aircraft, and the aircraft records furnished by . . . Elliott to . . . [Mercer] . . . [Mercer] was unable to obtain the information required by the F.A.A. for the issuance of a certificate of airworthiness for the aircraft for the reason that the F.A.A. refused to issue a certificate of airworthiness for the aircraft until the records pertaining to said modifications, as described above, were furnished to and approved by the F.A.A. at Burbank.

"XII

". . . [Mercer] did not perform an 8,000 hour airframe inspection on the aircraft for the reason that said overhaul was not required under the applicable F.A.A. requirements. Such an inspection does not relate to structural and design changes in an aircraft and would not furnish the information concerning said prior modifications required by the F.A.A. for the issuance of a certificate of airworthiness. An 8,000 hour inspection is primarily an inspection of the airframe in accordance with an F.A.A.-approved maintenance manual, accompanied by a replacement or repair of defective or overtime parts where necessary, but said inspection is not directed to or concerned with the design and structural changes and modifications in the configuration and basic structure of the aircraft, such as the modifications to the aircraft referred to in paragraph VII(b), above, or the methods or quality of work involved in making such changes and modifications. The adequacy and acceptability of the modifications to the aircraft referred to in paragraph VII(b), above, so as to qualify for the issuance of a certificate of airworthiness by the F.A.A., involves highly technical matters of aeronautical engineering and design which can be resolved only by a careful examination of the detailed engineering drawings and specifications for such modifications in relation to the basic design and construction of the entire aircraft, together with an inspection of the pertinent parts of the aircraft

to determine that the modifications made in fact conform to those approved in theory. Cross-defendant Elliott failed to furnish the requisite records to show the engineering design and specifications involved in the modifications or the precise modifications which were in fact made to the aircraft, neither of which can be determined by an inspection of the aircraft alone. Because of the technical nature of the records required to meet the F.A.A. requirements in this case, and . . . [Mercer's] lack of technical knowledge in this field . . . [Mercer] was unable to determine whether the records furnished from time to time by . . . Elliott between July, 1957 and October, 1958, inclusive, were adequate to meet the F.A.A. requirements in order to obtain a certificate of airworthiness, or that . . . Elliott was in fact concealing the non-existence of the records required to obtain the certificate of airworthiness.

"XIII

" . . . [Mercer] made various oral and written demands on . . . Elliott after July 5, 1957, the exact dates of which are unknown to . . . [Mercer], for said aircraft records which . . . Elliott represented would be furnished at the time of the delivery of said aircraft. Following each such demand made by . . . [Mercer] on . . . Elliott for said aircraft records . . . Elliott represented in substance that he was making every effort to secure the necessary records and that said records would be obtained by him and delivered to . . . [Mercer]. In reliance upon said representations . . . [Mercer] performed extensive repair and maintenance work on said aircraft during 1957 and 1958, as described in paragraph X, above, in order to obviate any delay in placing the aircraft in commercial operations after . . . Elliott supplied the necessary aircraft records required to obtain a certificate of airworthiness for the aircraft.

"XIV

" . . . [Mercer], in further efforts to expedite the certification of the aircraft by the F.A.A., sent letters to the former owners of said aircraft . . . requesting information concerning prior overhauls and modifications to the aircraft, and requesting pertinent records and information concerning the history of said aircraft. The correspondence between . . . [Mercer] and said former owners extended over the period from July 5, 1957, to and including September, 1958. None of said former owners furnished to . . . [Mercer] or to the F.A.A. any records or information concerning the modifications to the aircraft referred to in paragraph VII(b), above.

"XV"

"During the latter part of 1957 and to and including October, 1958 . . . Elliott furnished or caused to be furnished to . . . [Mercer] or to the F.A.A. from time to time certain information and drawings relating to the prior modifications of the aircraft described in paragraph VII(b), above. On each such occasion, the exact dates of which are unknown to . . . [Mercer], that information or documents relating to the aircraft were furnished to . . . [Mercer] . . . [Mercer] in turn furnished such information or documents to the F.A.A. office at Burbank, California, for the purpose of obtaining a certificate of airworthiness for said aircraft. On each such occasion . . . [Mercer] was informed by the F.A.A. at Burbank, California, that the information and documents so furnished were insufficient and inadequate to describe the nature, type and extent of the prior modifications to said aircraft and any prior approval by the F.A.A., and that the Burbank office of the F.A.A. could not for those reasons issue a certificate of airworthiness for said aircraft.

"XVI

"Upon each such refusal of the F.A.A. to certificate said aircraft as aforesaid . . . [Mercer] thereupon made another demand upon . . . Elliott for said aircraft records necessary to permit the certification of

the aircraft. On each such occasion . . . Elliott represented again to . . . [Mercer] that he would make further efforts to secure the necessary records which . . . Elliott represented, were located in or around Detroit, Michigan. On each such occasion . . . Elliott further represented that the records necessary to obtain a certificate of airworthiness for the aircraft were in existence and that every effort was being made to obtain them.

## "XVII

"The last such information furnished concerning the prior modifications to said aircraft described in paragraph VII(b), above, was furnished at the instance of . . . Elliott to the F.A.A. on October 14, 1958. A copy of said letter is attached hereto as Exhibit A and incorporated by reference herein.[2] Said information was contained in a letter from Robert Dale, an F.A.A.-licensed aircraft inspector, who . . . Elliott represented to be an agent of . . . Elliott. Said Robert Dale furnished to the Burbank office of the F.A.A. certain information concerning the history and prior modifications of said aircraft. Said letter from Robert Dale of October 14, 1958, was the culmination of a series of telephone conversations and letters between said Robert Dale . . . [Mercer] and the F.A.A. representative in Burbank, California, concerning the prior history of and modifications to said aircraft. Said telephone calls and correspondence extended over the period from approximately July, 1957, to and including October 14, 1958.

## "XVIII

"In addition to the foregoing . . . [Mercer] during the period from July, 1957, to and including September, 1958, exchanged numerous letters and telephone calls, the exact dates of which are unknown to . . . [Mercer] with Aircraft Conversion, Incorporated, of Detroit, Michigan, the company which had performed a number of the prior modifications to said aircraft, described in paragraph VII(b), above, for . . . Elliott. During said period, Aircraft Conversion, Incorporated, furnished to . . . [Mercer] and to the F.A.A. in Burbank, California, information and documents concerning said prior modifications to said aircraft. Attached hereto as Exhibits B,[3] C,[4] and D,[5] and incorporated by reference herein, are copies of letters from Aircraft Conversion, Incorporated, dated June 25, June 27, and October 9, 1958, respectively, sent to . . . [Mercer] and relating to the efforts of . . . [Mercer] to obtain the aircraft records pertaining to said aircraft.

## "XIX

"Both Aircraft Conversion, Incorporated and said Robert Dale represented to . . . [Mercer] on various occasions during said period that said prior modifications to said aircraft had been approved by a licensed F.A.A. representative in Detroit, Michigan. All of the information and documents furnished to . . . [Mercer] by Aircraft Conversion, Incorporated were in turn furnished to the Burbank office of the F.A.A. On each such occasion . . . [Mercer] was informed by a representative of the FA.A. at Burbank that the information and documents submitted were insufficient and inadequate to permit the issuance of a certificate of airworthiness for said aircraft.

## "XX

"Notwithstanding that . . . [Mercer] was furnished with information and documents from time to time extending over the period from July, 1957, to and including October, 1958, and notwithstanding further that Aircraft Conversion, Incorporated and said Robert Dale both stated to . . . [Mercer] that said prior modifications to said aircraft had been approved by a F.A.A. representative in Detroit, Michigan . . [Mercer]

---

[2] and [3] see p. 329; [4] and [5] see p. 330.

was unable to obtain a certificate of airworthiness for said aircraft from the F.A.A. at Burbank. The Burbank office of the F.A.A. had jurisdiction of said aircraft from and after July 5, 1957, and had the sole authority to issue a certificate of airworthiness for said aircraft. No additional information or documents concerning the prior modification to said aircraft were furnished to . . . [Mercer] after the month of October, 1958, and . . . [Mercer] has been unable to obtain a certificate of airworthiness for said aircraft from the F.A.A. for the reasons alleged hereinabove.

## "XXI

"Cross-defendant Elliott at all times concealed from . . . [Mercer] the actual condition of the aircraft as alleged hereinabove, and the actual extent and condition of the aircraft records pertaining to the modifications referred to in paragraph VII(b), above, and the non-existence of the critical records required by the F.A.A. as a condition to the issuance of a certificate of airworthiness, as aforesaid, and . . . Elliott misrepresented such facts to . . . [Mercer] as alleged hereinabove for the purpose of inducing . . . [Mercer] to rely thereon and to lull . . . [Mercer] into believing that . . . Elliott in fact could and would obtain the aircraft records required for the certification of said aircraft. Until within several weeks after October 14, 1958, after . . . [Mercer] had exhausted all reasonable efforts to secure the information required by the F.A.A. as alleged hereinabove . . . [Mercer] did not discover that . . . Elliott had in fact concealed the truth and the fact of his misrepresentations from . . [Mercer], as aforesaid; but on the contrary . . . [Mercer] believed and relied upon each and all of said representations and was thereby induced to expend his time, efforts and money in futile attempts to obtain a certificate of airworthiness for the aircraft. and to repair and preserve the aircraft, believing that . . . Elliott was making reasonable efforts to furnish the information and records required by the F.A.A. for the issuance of a certificate of airworthiness.

## "XXII

"Thereafter, all efforts by . . . [Mercer] to secure said records and documents and to obtain approval from the F.A.A. for said modifications to said aircraft having failed . . . [Mercer], on or about June 2, 1959, served a notice of rescission on cross-defendants Tuttle, Koenen, and Aviation Finance, rescinding said aircraft lease between . . . [Mercer] and said cross-defendants.

## "XXIII

"As a proximate result of said false and fraudulent representations made by . . . Elliott to . . . [Mercer], . . . [Mercer] has been damaged in the following amounts:

"(a) The amount of $24,200.00, representing lease payments made by . . . [Mercer] since July 5, 1957, to cross-defendants Tuttle, Koenen, and Aviation Finance pursuant to the lease of said aircraft entered into between . . . [Mercer] and said cross-defendants;

"(b) The amount of $29,729.98, representing amounts actually paid by . . . [Mercer] for materials, labor, insurance, taxes, and miscellaneous items with respect to said aircraft, pursuant to said lease with cross-defendants Tuttle, Koenen, and Aviation Finance;

"(c) The cost of defending against the complaint filed by cross-defendant Aviation Finance herein, and of prosecuting the cross-complaint filed herein by . . . [Mercer] against cross-defendants Tuttle, Koenen, and Aviation Finance, including attorneys' fees in connection therewith;

"(d) The amount of $5,000.00, representing the amount paid by . . . [Mercer] to . . . Elliott for said option to purchase said aircraft;

"(e) Loss of use of said aircraft from July 5, 1957 to February 1,

1961, in the amount of $63,000.00, plus additional loss of use after February 1, 1961, in an amount as yet unascertained.''

[2]The letter dated October 14, 1958 (Exhibit A) provides in part as follows:

''This is to confirm our telephone conversation of today regarding Douglas DC-3. . . .

''In order to expedite the certification . . . I enclose my copy of the minutes of the meeting of the Type Certification Board for General Aircraft Co., Inc., Modified Douglas DC-3 (Challenger 250) . . .

''At the time of the approval of this project (STC SA3-2) there existed a change in CAA procedures and it was not too clear as to exactly the proper procedure to follow. In order to be sure, the 337 & TIA procedure of approval was followed, namely:

''1. Submit three copies of Form . . . to Engineering.

''2. Engineering established a TIA. . . .

''3. Engineering approves the structural and powerplant phase, subject to inspection.

''4. CAA conducts a ground airworthiness inspection of the airplane.

''5. CAA conducts a ground conformity inspection of the modifications.

''6. CAA conducts flight tests of the modified airplane.

''7. Final approval (stamp) by engineering of the modification.

''8. Issue the STC to the applicant.

''9. Ordinarily the next step would be to return the airplane to service. This was not done as the aircraft condition was such that it was impossible to recertificate it. There was no interior of any kind. A complete electrical system was required and numerous other maintenance operations were needed. Thus the returned Form . . . was never fully put into effect. However, I think you can see that the modifications had to be in conformity to the technical data otherwise STC SA3-2 would never have been issued.

''Historically this airplane was structurally rebuilt by. . . . After the basic aircraft was built up to include all structural CAA AD's & Douglas bulletins which were in effect at that time, the airplane was purchased for use by General Aircraft Company as a prototype airplane to conduct their program of modifications. These modifications are described on the reverse side of approved Form ACA 337, dated June 11, 1956, signed by me. After the testing program the . . . engines were removed as they needed overhaul. The airplane was then put in storage less engines. Later the airplane was sold and the purchaser shipped to Detroit a pair of engines and sent two of his crew to Detroit to install the engines. Upon completion of the installation of the engines I turned over to them Form 337's which described the rebuilding which had been accomplished by. . . . A ferry permit was obtained and the airplane was flown to California. Probably you can trace the record from here on.

''The airplane can be certificated as 'N' or 'T' category providing all applicable parts of Aircraft Spec. A669 are met and further provided an approved flight manual is in the airplane when operated above 25,200 pounds gross weight (25346 with deiver [sic]). Please refer to General Aircraft Drawing 801-250.

'' . . . . . . . . . .

[3]The letter dated June 25, 1958 (Exhibit B) provides in part as follows:

''Enclosed please find drawings and installation procedure for the Pitot system which will be shipped this date under separate cover. . . . I trust this will take care of this phase of your problem.

''In reference to the rudder problem, I have been able to come up with information indicating that the proper 337 relating to the geared

rudder tab was given to the men at time of delivery of the ship and should be found in those records. I am having our DER's file copy photostated, and will forward same to you within the next few days.

''We are at this time attempting to gather sufficient information to establish the fact that the wing tip re-work was accomplished in accordance with Manual 18 and will provide sketches to substantiate this work. Also, I have contacted the A & E who was assigned to the project along with other mechanics, and I am confident a statement and 337 form will cover this problem within the next few days.

'' . . . . . . . . . .

---

[4]The letter dated June 27, 1958 (Exhibit C) provides in part as follows:

''. . . Enclosed you will find a photostat copy of a form 337 which substantiates the proper installation of the Air Research geared rudder tab. . . .

''Relative to the wing tip re-work, this is covered by a sketch which was done by the supervisor in charge of that project. It was sketched from memory and it will be necessary for you to have your mechanic remove the outboard section and vertify [sic] the modification. It was accomplished according to Manual 18 and where necessary changes were made by inspection and approval of a DER.

''Your mechanics can inspect this and have an A.I. run an inspection and issue a form 337. . . .''

---

[5]The letter dated October 9, 1958 (Exhibit D) provides in part as follows:

''Enclosed you will find drawing . . . which will clarify for you and the local CAA inspector the application of the modifications manufactured by Aircraft Conversation [sic], Inc.