[No. B066993. Second Dist., Div. Three. Sept. 14, 1993.]

JEFFREY A. ROCHLIS, Plaintiff and Appellant, v.
WALT DISNEY COMPANY et al., Defendants and Respondents.

COUNSEL

Rintala, Smoot, Jaenicke & Brunswick, William T. Rintala, J. Larson Jaenicke and Sharon Oxborough for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker, Paul Grossman, William S. Waldo, Paul W. Cane, Jr., and George W. Abele for Defendants and Respondents.

OPINION

**CROSKEY, J.**—The plaintiff and appellant, Jeffrey A. Rochlis (Rochlis) appeals from a summary judgment entered against him on his four-count first amended complaint. He had sued the defendants and respondents, The Walt Disney Company (Disney), Walt Disney Imagineering (WDI) and Martin A. Sklar (Sklar) (collectively, the defendants) for damages arising out of his employment by Disney and WDI and the subsequent termination of that employment in 1989. Rochlis argues that summary judgment was improper because material issues of fact remain to be resolved with respect to each of his four alleged causes of action.

We conclude that the evidentiary showing made by the defendants demonstrated that they were entitled to judgment, as a matter of law, on each of Rochlis's claims. We also reject Rochlis's argument that the trial court improperly shifted to him the burden of providing evidence. We therefore will affirm the judgment.

## Factual and Procedural Background

As this matter comes to us as an appeal from a summary judgment, we examine the facts demonstrated by the *admissible* evidence submitted by the parties.[1] The following recitation of the facts is based upon Rochlis's own deposition testimony and documentary evidence about which there is no dispute.

Rochlis went to work for Disney in February 1985 as an assistant to the chairman. In April of that year, he was appointed Senior Vice-President of Finance and Administration and given a written contract which provided for a $225,000 annual salary and a three-year term. As Rochlis conceded in his deposition, this was an important commitment by Disney which gave him job security. However, he admits also recognizing that neither he nor Disney would have any legal obligation for continued employment after the expiration of that contract.

Sometime prior to October 1987, Rochlis became unhappy with his position as it involved primarily administrative and managerial duties and he desired to become involved in more creative activity. Indeed, he expressed the view to a number of people that he would probably leave Disney when his contract expired if he could not be transferred to a more satisfactory job.[2]

Disney, apparently anxious to retain Rochlis, sought to accommodate his desire for a new position and after some discussion offered him a position at WDI.[3] He accepted and, on October 6, 1987, became WDI's executive vice-president, its second highest position. While his primary responsibilities were still to be in the area of finance and management, he was told he would have input, although not a decisionmaking role, in creative matters.[4]

Apparently, the negotiations of the financial terms for this job were somewhat extended; but at their conclusion in the fall of 1988 it was orally

---

[1]We emphasize this point here because a significant portion of the evidence relied upon by Rochlis is contained in his declaration as to which the trial court sustained objections by the defendants.

[2]Specifically, Rochlis testified that ". . . if there wasn't [such an opportunity], I was not interested in renewing my contract."

[3]WDI, a division of Disney, was then engaged in several major design, engineering and construction projects including Disneyland's Splash Mountain, Euro Disneyland near Paris and Typhoon Lagoon and Pleasure Island at Walt Disney World in Florida.

[4]Rochlis's testimony on this point reflects that he was told by Frank Wells, the President of Disney, that he would have access to Disney senior management and would be a participant in all relevant meetings relating to WDI's creative activities; in addition, he states he was assured he would have administrative control of WDI and that he would be responsible to the president and chief executive officer of Disney. As we discuss below, these "promises," even if made, cannot be enforced in a court of law, at least in the context of the issues and claims raised here.

agreed that Rochlis's salary of $225,000 would remain initially but at the end of 1988 it would increase to $250,000. In addition, he would be paid a discretionary bonus and would receive stock options. Disney offered 8,000 options; Rochlis insisted on, and ultimately received, an agreement for 20,000. As to the question of a contract for a term of years, Disney refused;[5] however, it was agreed that if Disney terminated the relationship then Rochlis would receive a year's salary as severance pay.[6]

Frank Wells, the President of Disney who negotiated the agreement with Rochlis, memorialized their agreement in a handwritten note which he gave to Rochlis with an invitation that Rochlis reduce to writing anything he thought appropriate as a further memorial. In neither Mr. Wells's note, nor in the handwritten note Rochlis later delivered to Wells, is there any mention of an agreement that Rochlis would be employed for a term of years. Indeed, it appears that the converse is true. Wells's note clearly specified that there would be "No K"; more to the point, Rochlis later signed the stock option agreement necessary to the vesting of his option rights and its provisions confirm the absence of any term agreement.[7]

This employment change, unfortunately, did not provide Rochlis with the job satisfaction he was seeking. Apparently, the various projects on which WDI was working were not going well and were, in significant part, behind schedule and over budget. This was evident to Rochlis within a few weeks after he assumed his new duties. For example, by January 1988, he expressed the view in a written memo that Splash Mountain was "a disaster." Indeed, by that time his "understanding was considerably different than what I was led to believe I was going to be doing when I got there."

By January 1988, Rochlis was convinced that, rather than himself, someone with a top construction background was needed by WDI to handle the massive construction projects such as Splash Mountain. Ultimately, Rochlis and Wells concluded that it was necessary to hire a person with such skills and Rochlis was authorized to do so.

In spite of his reservations about his ability to solve WDI's immediate problems Rochlis, in January 1988, felt that his compensation was inadequate for the size of the job and he proposed an increase in his salary from

---

[5]The record reflects that no WDI employee had such a contract.

[6]We believe it to be worth emphasizing that these negotiations, and the ultimate agreement, took place over nearly a 12-month period *after* Rochlis had accepted the new position at WDI.

[7]The stock option agreement provides, in pertinent part: "f. *No Rights to Award.* No employee or other person shall have any right to be granted an award under the Plan. Neither the Plan nor any action taken hereunder shall be construed as giving any employee any right to be retained in the employ of Disney or any of its subsidiaries or shall interfere with or restrict in any way *the rights of Disney or any of its subsidiaries, which are hereby reserved, to discharge the employee at any time for any reason whatsoever, with or without good cause.*" (Italics added.)

$225,000 to $300,000. While Wells promised to consider the matter, nothing happened for several months. In July 1988, Rochlis reminded Wells of the matter and Wells proposed a one-time $100,000 special bonus but not a salary adjustment. Rochlis rejected this as inadequate. Wells also rejected Rochlis's request that he be given the title as WDI's president. However, as we have already described, there was an ultimate agreement on a salary increase to $250,000 (effective on January 1, 1989), plus a discretionary bonus.

Although no one at Disney had indicated that he might be fired and he had no expectation that he would be discharged, his increasing dissatisfaction with his job and the amount of his compensation led him to the conclusion that he had to leave. On January 27, 1989, he resigned.[8] Prior to doing so, he did not seek any other position with Disney. Several months later he entered into negotiations with a company known as King World. These negotiations ultimately resulted in a three-year employment contract beginning in February of 1990. The record reflects that the compensation provided for in such agreement was significantly more lucrative than what he had enjoyed at Disney. However, after seven months in that job he resigned from King World, claiming that he had been constructively discharged. He settled the ensuing dispute with King World and then filed this action against the defendants on October 31, 1990.

Rochlis asserted separate claims for breach of contract, fraud, defamation and conspiracy. After a successful demurrer, which resulted in the filing of a first amended complaint on January 30, 1991, defendants filed a motion for summary judgment. On March 10, 1992, that motion was granted. The court concluded that (1) there was no breach of contract because (a) Rochlis was an employee at will by virtue of the stock option agreement he had signed which negated any implied contract and, (b) there was no constructive discharge as a matter of law; (2) the fraud claim was rejected because Rochlis's acceptance of the WDI position did not result in any damage and, in any event, there was no detrimental reliance; (3) the defamation claim failed because the four alleged defamatory statements were not actionable;[9] and (4) the conspiracy claim necessarily depended for its validity on the other counts and, since they were rejected, there could be no actionable conspiracy.

---

[8]In a handwritten note to Frank Wells, dated January 13, 1989, Rochlis stated, "The situation here is intolerable. My last day will be January 27 unless, of course, you wish me to leave sooner."

[9]Although Rochlis asserted four alleged defamatory statements in his first amended complaint, he has raised an issue on appeal as to only one. He claims that his superior at WDI stated that he had been fired. However, that official denied ever making the statement and the only evidence offered by Rochlis was the hearsay statement of another WDI official to which defendants successfully objected.

After entry of judgment against him, Rochlis filed this timely appeal.

## CONTENTION OF THE PARTIES

Rochlis contends that the judgment must be reversed because issues of material fact remain to be resolved as to each of his four causes of action. With respect to the breach of contract claim, Rochlis contends that defendants have not negated every theory on which he might recover; specifically they have failed to prove that (1) he was an employee at will, that (2) he was not constructively discharged or (3) other promises which were made to him were not breached. Similarly, Rochlis argues that defendants failed to negate the fraud element of detrimental reliance or demonstrate that he suffered no damages. Finally, he claims that issues of material fact still remain as to whether he was defamed.

Defendants dispute each of these contentions and argue that the trial court's ruling was correct for the reasons stated.

## DISCUSSION

### 1. Standard of Review

"Summary judgment is properly granted when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c; [citations].) The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. [Citation.] [¶] Appellate review of summary judgment is limited to the facts contained in the documents presented to the trial court. This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties' papers. [Citations.] In so doing, we apply the same three-step analysis required of the trial court: We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determime whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*Torres* v. *Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52].)

### 2. Defendants Did Not Breach Any Contract of Employment With Rochlis

#### a. Rochlis Was an At-will Employee

■ Critical to the success of Rochlis's breach of contract claim is the assertion, set out in the first amended complaint, that he had an implied

agreement with Disney that he would be terminated only for just cause. He relies upon the argument that he had a contractual commitment which was implied from several circumstances such as an extended employment history, promotions and so forth.

The trial court properly rejected this claim as a matter of law. ██ Labor Code section 2922 establishes a presumption that an employment relationship of unspecified duration is an "at-will" employment and may be terminated at any time by either party. This presumption may be overcome by evidence of an implied agreement that the employment would continue indefinitely pending some just cause for its termination. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 680 [254 Cal.Rptr. 211, 765 P.2d 373].) ██ While Rochlis alleges the existence of some of these factors which he claims raise issues of fact (see *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 14-15 [267 Cal.Rptr. 618]), the *evidence* presented in support of and in opposition to the motion for summary judgment clearly demonstrates the contrary.

While Rochlis *was* still employed under a contract for a specified term he requested a new and more challenging position. During the negotiations for his new position as executive vice-president of WDI in October 1987 he sought a commitment for a specified term. This was rejected. This fact, which is not disputed, undercuts any claim that such a commitment was to be implied. It would be error for a court to imply a contractual term which the parties themselves had expressly rejected during their negotiations.

This conclusion is reinforced by the terms of the stock option agreement which was signed by Rochlis. That agreement expressly provided that Disney reserved the right to discharge the signatory employee "at any time for any reason whatever."[10] We directly addressed this issue in *Shapiro* v. *Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467 [199 Cal.Rptr. 613]. In that case, we were presented with the identical argument advanced by Rochlis. In considering language in a stock option agreement nearly identical to that found here[11] we held that such language was sufficient to define the employment relation as one at will. "There cannot be a valid express

---

[10]See footnote 7, *ante*, for full text of the reservation clause. Rochlis asserts in his declaration that this should be disregarded because he was aware of a number of Disney employees who had term contracts but who also were signatories to the stock option agreement. We reject this reasoning. The language of the stock option agreement is not incompatible with another *express* agreement providing for term employment. However, it is inconsistent with a claimed *implied* agreement for a specified term.

[11]The relevant clause in the *Shapiro* stock option agreement provides: "Nothing in this Stock Option Agreement or in the Plan shall confer upon the Employee any right to continue in the employ of the Trust or the Advisor or *shall interfere with or restrict in any way the*

contract and an implied contract, each embracing the same subject, but requiring different results. [Citations.] Therefore, [the employee's] allegations of an implied-in-fact contract for continuing employment and benefits cannot rebut his status as an at-will employee." (*Id.*, at p. 482.)

### b. *Rochlis Quit and Was Not Constructively Discharged*

The undisputed facts demonstrate that Rochlis, dissatisfied with his position and compensation at WDI, resigned on January 27, 1989. (3) He voluntarily terminated his own employment and cannot successfully claim to have been constructively discharged without a showing of "actions and conditions so intolerable or aggravated at the time of his resignation that a reasonable person in the employee's position would have resigned, and whose employer had actual or constructive knowledge of the intolerable actions and conditions and of their impact upon the employee and could have remedied the situation, but did not, . . ." (*Zilmer* v. *Carnation Co.* (1989) 215 Cal.App.3d 29, 38 [263 Cal.Rptr. 422].)

While Rochlis argues that he was constructively discharged, there is simply no evidence in this record to demonstrate that there existed the required intolerable actions or conditions. The standard which we articulated in *Zilmer* is an objective one. The question is whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit. (*Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299, 1306 [242 Cal.Rptr. 324]; *Lojek* v. *Thomas* (9th Cir. 1983) 716 F.2d 675, 681.)

■ As we understand Rochlis's claim of intolerable conditions, it appears that (1) his job at WDI was not what he had expected it to be; that is, it was much more difficult and there were more problems with several of WDI's projects than he had understood when he had accepted the position, (2) he was not given sufficient authority to carry out his responsibilities, (3) he did not receive as much compensation as he thought he deserved and (4) he was criticized for many of the problems at WDI.

Even assuming the accuracy of such claims, we cannot conclude that they meet the intolerable conditions standard which is required in order to find a constructive discharge. Criticism of job performance and inadequate compensation, even a demotion or reduction in pay (which did not occur here), are not grounds for a constructive discharge. (*Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 400-401 [3 Cal.Rptr.2d 6].)

rights of the Trust or the Advisor, which are hereby expressly reserved, to discharge the Employee at any time for any reason whatsoever, with or without good cause." (Italics added; *Shapiro* v. *Wells Fargo Realty Advisors, supra,* 152 Cal.App.3d at p. 473.)

We concur with the defendants' observation that such claims do nothing more than describe "the stresses and strains characteristic of life at the top of a major corporation." It appears reasonable to us that a highly paid executive is more likely to be given tough problems to solve, and sometimes things just do not work out in an expected or hoped-for manner.

Moreover, there is nothing in Rochlis's description of his job difficulties that was not known to him by the end of January 1988, a full year before he resigned. Nonetheless, he stayed on in the job. In fact, he stayed on nine months after his contractual commitment expired in April 1988. Given such circumstances we are unable to conclude that there was a constructive discharge. We are aware of no case which has found a constructive discharge under such circumstances as are presented here. Rochlis (1) felt his job was difficult, (2) complained that he had not been given sufficient authority, (3) believed he was underpaid and (4) was criticized for the company's performance. These are common conditions for highly paid senior executives; they hardly meet the standard required for a constructive discharge.

### c. The Additional Contractual Promises Asserted by Rochlis Will Not Support a Claim for Breach of Contract

Rochlis alleges in his first amended complaint that a number of promises were made to him 1987 when he negotiated the agreement which led to his transfer to WDI and that none of them were performed. He outlines these in his opening brief: (1) he would receive a salary of $225,000 per year through December 31, 1988, and reasonable salary increases appropriate to his responsibilities and performance; (2) he would receive reasonable annual bonuses appropriate to his responsibilities and performance;[12] (3) he would participate in all meetings that Sklar (president of WDI) had with Wells and/or Eisner, (president and chief executive officer, respectively, of Disney); (4) he would actively and meaningfully participate in all WDI creative activities; (5) he would be in charge of all administrative matters concerning WDI and all officers and employees would report to him administratively; (6) he would report directly to Wells and Eisner; and (7) WDI would be subject to direction only by Wells and Eisner and not by any other Disney subsidiary or the management of that subsidiary.

Assuming such commitments were made, they are simply too vague and indefinite to be enforceable. For example, promises to pay salary increases

---

[12]In fact, as we have already noted, the evidence reflects that the negotiations which led to the agreements on Rochlis's increased compensation did not take place until the fall of 1988; indeed Rochlis did not begin pressing for a salary increase until January 1988, three months *after* he moved to WDI.

or bonuses which are "appropriate" to Rochlis's responsibilities and performance or that Rochlis would have an "active and meaningful" participation in creative decisions are not capable of enforcement in a court of law. (See, e.g., *Robinson & Wilson, Inc.* v. *Stone* (1973) 35 Cal.App.3d 396, 407 [110 Cal.Rptr. 675]; *Hoxsie* v. *Clark* (1965) 234 Cal.App.2d 370, 374-375 [44 Cal.Rptr. 399]; *Ellis* v. *Klaff* (1950) 96 Cal.App.2d 471, 478 [216 P.2d 15].) Similarly, alleged commitments regarding Rochlis's participation in all corporate meetings involving certain individuals and attempts to define reporting and administrative responsibilities are beyond regulation by the courts, at least in the absence of a dispute (which we do not have here) as to whether an employee has in fact performed specifically agreed upon tasks. Litigation cannot become a vehicle for the micromanagement of day-to-day corporate affairs.

Rochlis seeks to make much of these alleged contractual commitments which he claims were breached by defendants. Indeed, one of his principal arguments is that the summary judgment should be reversed because defendants have failed to negate each of these claims. Leaving aside the issue of the evidentiary burden of the defendants, we conclude that these promises allegedly made by the defendants will not support a breach of contract claim in any event. They are not sufficiently certain to be enforced and would improperly impose on the court the burden of making financial and management decisions better left to the parties.

 d. *In the Absence of a Constructive Discharge Rochlis Has No Claim for Contract Damages*

 █ The contract damages sought here by Rochlis are entirely *post-quit* damages.[13] However, in order for him to be entitled to recover such damages he must first establish that he has been constructively discharged. In the absence of evidence of such a discharge there has been no breach of contract and therefore no basis for a recovery. (*Kane* v. *Sklar* (1954) 122 Cal.App.2d 480, 482 [265 P.2d 29].)

 The point is well illustrated by *Warner Bros. Pictures, Inc.* v. *Bumgarner* (1961) 197 Cal.App.2d 331 [17 Cal.Rptr. 171], a case, curiously enough, relied upon by Rochlis. When the studio, relying on a *force majeure* clause (a writer's strike was then in progress), suspended weekly payments to actor James Garner, he declined to perform further services arguing that the studio had breached his contract. The studio filed suit for declaratory relief and Garner cross-complained for damages. The court held that the studio's

---

[13]Rochlis makes no claim that WDI did not pay all compensation that was due to him up to the time of his resignation.

refusal to pay was a breach of contract which justified Garner in terminating the contract, but it did not give him the right to sue for damages. " '[The] mere failure of the [employer] to pay wages to the [employee] does not amount to a discharge. . . . Such failure or refusal to pay merely gives the [employee] the option of quitting his employment and the right to sue for the salary then due and unpaid, or of continuing in the service, with the corresponding right to require and enforce payment of the salary as it accrues.' " (*Id.*, at p. 353, quoting from *Percival* v. *National Drama Corp.* (1919) 181 Cal. 631, 637-638 [185 P. 972], italics deleted.)

The point which this case illustrates is that damages other than pre-quit damages (i.e. unpaid salary, or other benefits) cannot be recovered in the absence of evidence that the employer has discharged the employee. Applied to this case, it means that Rochlis has no basis for recovering the only damages which he seeks (i.e., *post-quit* damages), unless there has been a constructive discharge. As we have discussed above, that did not occur here.

### 3. There Is No Basis for Rochlis's Fraud Claim

The trial court rejected Rochlis's fraud claim on the alternative grounds of (1) no detrimental reliance and (2) no damage. We believe the court was correct on both points.

Rochlis admittedly was under contract to Disney until April 1988. He went to WDI in October 1987 based on what he now claims were fraudulent misrepresentations concerning WDI's condition and the status of its various pending projects. By January 1988, while he was still under his term contract, he had discovered the "truth" and had become familiar with all of the problems which WDI had and which he was being asked to solve. Yet, in spite of such knowledge, he stayed on for nine months *beyond* the expiration of his contractual commitment. Indeed, during this period he continued to press for, and ultimately obtained, the substantial bonus and salary increase previously described. Before he took the WDI position he had expressed the view that he "was not interested in renewing my contract."

Since, by April of 1988, he had become fully aware of all of the problems which he argues were previously not disclosed to him, but nonetheless decided to remain, we conclude, as did the trial court, that he did not detrimentally rely on any misrepresentations as a matter of law. (*Mercer* v. *Elliott* (1962) 208 Cal.App.2d 275, 279 [25 Cal.Rptr. 217]; *Carpenter* v. *Hamilton* (1936) 18 Cal.App.2d 69, 71-72 [62 P.2d 1397].)

With respect to the issue of damages, it seems obvious on this record that Rochlis did not sustain any. He bargained for and received more

money for his time at WDI than he would have received had he remained at Disney (in a job he repeatedly stated he no longer wanted). Thus, to that extent, he was enriched, not damaged, by his move to WDI. Rochlis responds that certain commitments and promises were made regarding "appropriate" financial rewards which were not honored. We have already discussed those. Promises too vague to be enforced will not support a fraud claim any more than they will one in contract.

Rochlis also argues that his experience at WDI damaged his ability to obtain employment elsewhere. However, not only is this claim unsupported by any admissible evidence, it is contradicted by the undisputed facts. Within one year after resigning his position with WDI, he obtained employment at King World which paid him $350,000 in salary and provided him with a three-year employment term. In addition, he negotiated (1) a bonus program which could have produced up to $2 million per year, depending on performance and (2) a stock option agreement for 150,000 options of King World stock. This arrangement, which was far more lucrative than what Rochlis had received at Disney, certainly negates the bare allegations that his reputation had been so damaged that he would have difficulty in obtaining employment elsewhere.[14]

We thus agree with the trial court's conclusion. This record demonstrates that Rochlis did not detrimentally rely on any representations by the defendants and, in any event, suffered no damages. Therefore, as a matter of law, there can be no actionable claim for fraud.

### 4. There Is No Actionable Claim for Defamation

Although the trial court rejected Rochlis's claims as to four separate allegedly defamatory acts, Rochlis only raises error on appeal as to one of them. ▌ He contends that an issue of fact exists as to whether the defendant Sklar had stated that Rochlis had been fired or discharged by WDI.

The record reflects that the defendants offered, in support of the summary judgment motion, Sklar's declaration that he did not make any such statement to anyone. Rochlis offered no admissible evidence to counter this denial. All that he presented was his own declaration testimony that someone at WDI (one Robert Gibbs) had told him that Sklar had made such a

---

[14]We again note that Rochlis, in spite of his three-year agreement with King World, resigned from that job after seven months, claiming that he had been constructively discharged and that the job had been misrepresented to him.

statement.[15] On defendants' objection this was rejected by the trial court as inadmissible hearsay. If that ruling was correct, then no evidence exists to counter Sklar's unequivocal denial.

Rochlis argues that the trial court's ruling was error since, although hearsay, Gibbs's statement was admissible as an authorized admission. (Evid. Code, § 1222.) Defendants, however, correctly point out that this would only be true where a proper foundation has been laid as to the declarant's authorization to speak on behalf of the party against whom the statement is offered. (See Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982) § 3.4, p. 180; *Dillon* v. *Wallace* (1957) 148 Cal.App.2d 447, 453 [306 P.2d 1044]; *Westman* v. *Clifton's Brookdale, Inc.* (1948) 89 Cal.App.2d 307, 311 [200 P.2d 814].) No such foundational showing is included in Rochlis's declaration.[16]

At most, Rochlis offered evidence only that Gibbs made certain statements to him. Given the state of the record, such statements were inadmissible for the purpose for which Rochlis offered them. There being no evidence whatever to raise an issue of fact as to Sklar's direct denial, the defendants were entitled to summary judgment on this issue.

### 5. *The Conspiracy Claims Must Fall Along With the Others*

Given our conclusions as to substantive claims pressed by Rochlis, the cause of action for conspiracy has no merit as a matter of law and summary judgment was properly granted. ■ In the absence of evidence of substantive civil wrong, there can be no separate cause of action for conspiracy. (*Manor Investment Co.* v. *F.W. Woolworth Co.* (1984) 159 Cal.App.3d 586, 595 [206 Cal.Rptr. 37]; *Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 762 [343 P.2d 118].)

---

[15]In his declaration, Rochlis stated: "In the days following my departure from Disney, I received several telephone calls from Robert Gibbs ('Gibbs'), who was vice president of human resources for Imagineering at that time. In one of those conversations, Gibbs told me that Sklar was trying to give people the impression that I was fired. He reported that Sklar, in response to questions about what had happened to me, was telling people that 'the Pleasure Island and Splash Mountain fiascos required a management change.' Gibbs went on to say that Sklar was 'vindictive' and had directed that 'Rochlis' office' and 'everything of Rochlis' be cleaned out by midnight.' "

[16]Defendants note in their brief that such evidence was available. They state that Gibbs had left Disney's employ by the time of the summary judgment hearing and thus no reason existed why he could not have directly provided evidence of Sklar's statements, if in fact they had been made in his presence. Defendants also state that Rochlis took Gibbs's deposition in September 1991, several months before the hearing.

### 6. *The Trial Court Did Not Apply an Improper Standard*

 Rochlis argues, with respect to his breach of contract and fraud claims, that the trial court improperly shifted to him the burden of providing evidence. He recites the rule that when " '. . . the plaintiff pleads several theories . . . the challenge to the opponent is made by the complaint, requiring the moving defendant to affirmatively react to each theory . . . or condition which supports a theory, if the motion is to be successful.' " (*Pultz v. Holgerson* (1986) 184 Cal.App.3d 1110, 1114 [229 Cal.Rptr. 531].) Rochlis argues that the trial court failed to apply this standard to the defendants' evidentiary showing and granted their summary judgment even though they had failed to negate any element of the breach of contract or fraud claims. We disagree.

As we have already noted, a defendant has successfully met his burden on a summary judgment motion when he has provided evidence which negates the plaintiff's claim. (*Torres v. Reardon, supra,* 3 Cal.App.4th at p. 836.) Thus, we do not quarrel with Rochlis's characterization of the defendants' burden. We do conclude, however, as did the trial court, that the defendants met their burden here.

Rochlis contends that defendants failed to negate the allegation of his complaint which charged defendants with breaching the oral commitments made to him when he negotiated his move to WDI. As we have already explained, those "promises" were either too vague or indefinite to be enforced or required the court to improperly engage in supervising or micro-managing the defendants' corporate affairs. In short, such allegations simply did not set forth an actionable claim for breach of contract. The defendants were therefore not required to present evidence negating such claims. What the defendants did address were the allegations of Rochlis which did purport to set forth an actionable claim, that is, his assertion that he had an implied contract that he would not be terminated except for cause and that he had been constructively discharged.[17] As we have discussed at some length, defendants clearly negated those claims, primarily from Rochlis's own deposition testimony.

Rochlis's argument regarding his fraud allegations are similar, with a similar result. He contends that the same "promises" found to be contractually unenforceable were fraudulently made. In addition, he alleged that false

---

[17]Rochlis argues that defendants, in order to negate any issue of fact as to a constructive discharge, were required to prove that Rochlis's working conditions were tolerable as a matter of law. We reject this contention and make special note of it here as a good example of the error which Rochlis makes. Defendants were only required to show that the particular working conditions described by Rochlis's own testimony did not constitute, as a matter of law, a work environment which would compel a reasonable person to quit. This they did.

representations were made about the condition and management of WDI. However, quite apart from those allegations the trial court found, on the basis of undisputed evidence, that no detrimental reliance was in fact present. In his deposition testimony, Rochlis admitted that he had been unhappy with his position at Disney and did not intend to stay after his commitment ended in April 1988. His switch to WDI did not alter his rights and obligations under that employment agreement. He gave up nothing by the move. Prior to the expiration of his contract he learned all of the "facts" which he claims had not been previously disclosed. Yet, he remained with WDI for another nine months and even negotiated a bonus and a substantial salary increase.

Rochlis's claim for fraud damages was equally devoid of substance. To put it simply, Rochlis received more not less by reason of his move to WDI, his claims for still greater rewards were based on vague and unenforceable "promises," any emotional stress damages he might claim fell within the exclusivity provisions of workers' compensation law (see *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 15-16 [276 Cal.Rptr. 303, 801 P.2d 1054]) and there was clearly no *admissible* evidence of any damage to his reputation.

In short, the trial court did not apply an improper standard in ruling on the defendants' motion nor did it improperly impose on Rochlis a burden of producing evidence. Defendants' motion was meritorious and summary judgment was proper because there was no substance to Rochlis's case. This was amply demonstrated by his own deposition testimony and the undisputed documents. It is long since past time that courts should hesitate to summarily dispose of meritless litigation upon nothing more than the smoke and mirrors presentation we have been offered here.

### DISPOSITION

The judgment is affirmed. The defendants shall recover their costs.

Klein, P. J., and Kitching, J., concurred.