[No. A040995. First Dist., Div. Four. Feb. 21, 1990.]

BARBARA A. LUCK, Plaintiff and Respondent, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY,
Defendant and Appellant.

[No. A042205. First Dist., Div. Four. Feb. 21, 1990.]

BARBARA A. LUCK, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY,
Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part V, and the concurring and dissenting opinion is certified for partial publication with the exception of footnote 3.

**COUNSEL**

Robert S. Bogason, Henry F. Telfeian, Wayne M. Bolio, Patrick W. Jordan, Julie Collins Nelson and McLaughlin & Irvin for Defendant and Appellant and Defendant and Respondent.

Kathleen Lucas-Wallace, Deborah C. England, Mark S. Rudy and Ellen Lake for Plaintiff and Respondent and Plaintiff and Appellant.

Edward M. Chen, John True, Joan Graff, Steven L. Mayer, Matthew G. Jacobs, Carl L. Blumenstein and Howard, Rice, Nemerovski, Canady, Robertson & Falk as Amici Curiae on behalf of Plaintiff and Respondent and Plaintiff and Appellant.

OPINION

**CHANNELL, J.**—Appellant Barbara A. Luck, a computer programmer employed by appellant Southern Pacific Transportation Company, was fired when she refused to submit a urine sample as part of an unannounced drug test by her employer. At trial, the jury awarded Luck $485,042 on her claims of wrongful termination, breach of the covenant of good faith and fair dealing, and intentional infliction of emotional distress. Southern Pacific appeals (case No. A040995), contending that (1) the federal Railway Labor Act preempts Luck's claims; (2) the state constitutional right to privacy does not prohibit it from requiring its employees to submit to drug urinalysis; (3) there was no breach of the implied covenant of good faith and fair dealing nor wrongful termination in violation of public policy; (4) punitive damages were not merited; and (5) Luck failed to mitigate damages. Although we find that several of Luck's theories of liability are without legal support, the jury's verdict can be upheld on proper grounds. Therefore, we affirm the judgment.

After trial, Luck applied for an award of attorney fees, without success. She appeals this ruling (case No. A042205), contending that she is entitled to fees at both trial and appellate levels. We affirm the trial court order and deny her petition for fees on appeal.

## I. FACTS

In July 1985, appellant Barbara A. Luck had been employed for almost six and a half years by appellant Southern Pacific Transportation Company (Southern Pacific). She had been hired in 1979 as a signal department draftsperson and spent the next three months coloring copies of design prints. Then, she accepted a position as the department's computer operator, maintaining its data base of railroad track crossroads locations. After two years in this position, she was promoted to computer programmer. For the last four years of her employment, she worked collecting information used to manage the engineering department. She wrote computer programs, taught others how to use them, and ran reports describing what employees did each day, where company equipment was located, and how much material was being used by employees.

On July 11, 1985, Luck and all other Southern Pacific engineering department employees were instructed to provide a urine sample and to consent to its testing for drugs, alcohol or medications. She viewed this as an offensive request and refused to comply. Luck met with several Southern Pacific officials that day and the next, but remained steadfast in her refusal to take the test. Company officials told her that they had no reason to

believe that she was impaired in her job performance. After these meetings, Luck believed that she had been suspended, but that before Southern Pacific took any further action she would be given a hearing. In a July 15 letter, Luck learned that she had been "relieved of all duties connected with [her] former position as Engineering Programmer" for failing to comply with the instructions of proper authority, i.e., for insubordination.[1]

Luck filed suit against Southern Pacific.[2] The case was tried on her second amended complaint[3] with the jury returning verdicts in her favor on her causes of action for wrongful termination in violation of public policy, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. The jury awarded Luck $180,092 in economic damages for lost compensation and benefits, $32,100 for emotional distress, and $272,850 in punitive damages. The trial court denied her posttrial motion for attorney fees.

## II. FEDERAL PREEMPTION

First, Southern Pacific contends that the trial court had no jurisdiction to try this case—that the federal Railway Labor Act (RLA) compels arbitration of Luck's wrongful termination claim and thus preempts her case. (See 45 U.S.C. §§ 151-188; see also 45 U.S.C. § 153(i).)[4] At trial, Southern Pacific's motion for nonsuit on this ground was denied. Although Luck was a union member when she was first hired by Southern Pacific, she was an exempt (nonunion) employee not covered by a collective bargaining agreement at the time of termination. Southern Pacific contends that the

---

[1] In November 1985, the San Francisco Board of Supervisors adopted an ordinance barring city employers from compelling employees to submit to random drug tests. The July 1985 drug testing at Southern Pacific occurred before this time.

[2] Luck also named as defendants Southern Pacific managerial employees Rodney Snyder, M.J. Karlovic, and D.I. O'Callaghan. The trial court found that these employees could not be held individually liable and dismissed the action against them. Luck appealed this decision, but dismissed the appeal after she obtained judgment against Southern Pacific in the trial court.

[3] The complaint stated causes of action for wrongful termination in violation of public policy, breach of the implied covenant of good faith and fair dealing, invasion of privacy, negligent and intentional infliction of emotional distress, and negligent misrepresentation. The trial court granted Southern Pacific's motions for nonsuit on invasion of privacy and for directed verdict on negligent misrepresentation. Negligent infliction of emotional distress was not submitted to the jury.

[4] Subdivision (i) of section 153 of title 45 of the United States Code provides: "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner . . . but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes."

RLA requires even nonunion employees to submit claims to arbitration before the adjustment board. Courts are reluctant to infer preemption, which Southern Pacific—as the party urging it—bears the burden of establishing. (See *Mungo* v. *UTA French Airlines* (1985) 166 Cal.App.3d 327, 332 [212 Cal.Rptr. 369].)

Federal legislation and case law guide state courts in matters presenting federal jurisdictional issues. (*Mungo* v. *UTA French Airlines, supra,* 166 Cal.App.3d at p. 331.) Congress enacted the RLA to promote stability in the railroad industry and to provide for prompt and efficient resolution of labor-management disputes arising out of railroad collective bargaining agreements. (*Evans* v. *Southern Pacific Transportation Co.* (1989) 213 Cal.App.3d 1378, 1383 [262 Cal.Rptr. 416]; see *Lewy* v. *Southern Pacific Transp. Co.* (9th Cir. 1986) 799 F.2d 1281, 1289.) The RLA creates a mandatory grievance procedure for resolution of "minor disputes." Minor disputes under the RLA involve the interpretation or application of an existing collective bargaining agreement. (*Leu* v. *Norfolk & Western Ry. Co.* (7th Cir. 1987) 820 F.2d 825, 828, fn. 7.) A minor dispute " 'contemplates the existence of a collective [bargaining] agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.' " (*Consolidated Rail* v. *Labor Executives* (1989) 491 U.S. 299, __ [105 L.Ed.2d 250, 261-262, 109 S.Ct. 2477]; see *Leu* v. *Norfolk & Western Ry. Co., supra,* 820 F.2d at p. 828, fn. 7; *Switchmen's Union of North America* v. *Southern Pacific Co.* (9th Cir. 1968) 398 F.2d 443, 445; see also *Miller* v. *Norfolk and Western Ry. Co.* (6th Cir. 1987) 834 F.2d 556, 561 [remand to determine whether defamation claim required interpretation of collective bargaining agreement].) The RLA's grievance procedures are exclusive; if the act applies, it preempts state and federal courts of subject matter jurisdiction over minor disputes. (*Consolidated Rail* v. *Labor Executives, supra,* 491 U.S. at p. __ [105 L.Ed.2d at p. 262]; see *Locomotive Engrs.* v. *L. & N. R. Co.* (1963) 373 U.S. 33, 38 [10 L.Ed.2d 172, 176-177, 83 S.Ct. 1059]; *Leu* v. *Norfolk & Western Ry. Co., supra,* at p. 828.) Any grievance arising out of a collective bargaining agreement is a minor dispute preempted by the act. (*Leu* v. *Norfolk & Western Ry. Co., supra,* at p. 829.)

A California appellate court has held that the RLA does not preempt a wrongful termination action brought by a nonunion employee when the dispute does not arise out of a collective bargaining agreement. (*Mungo* v. *UTA French Airlines, supra,* 166 Cal.App.3d at pp. 330-332.) Southern Pacific contends that this case was wrongly decided because it failed to consider several cases in which nonunion employees were required to sub-

mit their claims to the RLA Adjustment Board. However, these cases all involve claims that required the application or interpretation of a collective bargaining agreement. While there are cases that apply the RLA to disputes that do not involve a collective bargaining agreement (see, e.g., *Thomas* v. *New York, Chicago & St. Louis R. Co.* (6th Cir. 1950) 185 F.2d 614, 616-617), this has not been uniformly done. In a recent case, the Seventh Circuit grappled with this question, ruling that there would be no reason to invoke RLA arbitration if the case presented no issue of the meaning or application of a collective bargaining agreement. The court admitted that the RLA defines the arbitrator's domain as employment disputes growing out of "grievances *or* out of the interpretation or application of [collective bargaining] agreements," implying that more than contract interpretation is covered. (*Lancaster* v. *Norfolk and Western Ry. Co.* (7th Cir. 1985) 773 F.2d 807, 814, cert. den. 480 U.S. 945 [94 L.Ed.2d 788, 107 S.Ct. 1602]; see 45 U.S.C. § 153(i).) However, the Seventh Circuit found this language to be redundant, holding that a "grievance" was a claim of violation of the collective bargaining agreement. "Congress had no intention of making a grievance a separate basis for arbitration from disputes over the interpretation or application of the collective bargaining contract." (*Lancaster* v. *Norfolk and Western Ry. Co., supra,* at p. 814.) Our Supreme Court cited *Lancaster* with approval when it stated that the line between a tort actionable in court and an employment dispute actionable only in a grievance arbitration proceeding is not sharp, except in extreme cases. (*DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 526 [235 Cal.Rptr. 292, 733 P.2d 614], cert. den. 484 U.S. 829 [98 L.Ed.2d 60, 108 S.Ct. 100].) Considering the conflicting federal authority on this issue, we are more persuaded by the analysis of *Lancaster,* which is consistent with *Mungo.*

The RLA Adjustment Board has no jurisdiction over disputes that do not arise out of collective bargaining agreements. (*Mungo* v. *UTA French Airlines, supra,* 166 Cal.App.3d at p. 331; see *Lancaster* v. *Norfolk and Western Ry. Co., supra,* 773 F.2d at p. 814.) As the Ninth Circuit explained it: "The jurisdiction of the Adjustment Board is not limited to disputes arising from provisions specifically included in a collective bargaining agreement. If the claim is founded upon some incident of the employment relationship, or an asserted one, the Board may determine *the meaning and effect of the provisions of the collective agreement* with reference either to an included or to an omitted case." (*Railway Labor Executives Ass'n* v. *Atchison, T. & S. F. Ry. Co.* (9th Cir. 1970) 430 F.2d 994, 996, italics added, cert. den. 400 U.S. 1021 [27 L.Ed.2d 632, 91 S.Ct. 582]; see *Consolidated Rail* v. *Labor Executives, supra,* 491 U.S. at p. __ [105 L.Ed.2d at p. 260] [drug testing as part of railroad's policy of requiring periodic physical examinations as implied term of collective bargaining agreement].)

As a nonunion employee, Luck is not automatically subject to a collective bargaining agreement. Her case turns on state law, not on the application or interpretation of a collective bargaining agreement. (See *Mungo* v. *UTA French Airlines, supra*, 166 Cal.App.3d at p. 331 [no basis for federal jurisdiction without allegation of violation of federal law]; see also *Lingle* v. *Norge Division of Magic Chef, Inc.* (1988) 486 U.S. 399, 406-410, 412-413 [100 L.Ed.2d 410, 419-421, 423, 108 S.Ct. 1877] [unanimous decision; state law issue is preempted by federal Labor Management Relations Act only if its determination requires interpretation of collective bargaining agreement].)[5] California's exercise of jurisdiction would not frustrate effective implementation of the RLA. (See *Mungo* v. *UTA French Airlines, supra*, at p. 331.) Thus, the RLA does not preempt Luck's claim and the trial court properly exercised jurisdiction over her case.

## III. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A. *No Tort Cause of Action*

■ Next, Southern Pacific argues that the issue of breach of good faith and fair dealing should have been decided as a matter of law—that the issue should never have been submitted to the jury. Its motion for directed verdict on this ground was denied. In essence, the railroad contends that Luck did not state a cause of action for breach of covenant of good faith and fair dealing—that it committed no bad faith act that could support such a theory of recovery.

■ A covenant of good faith and fair dealing is implied in every contract. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373]; see *Zurn Engineers* v. *State of California* ex rel. *Dept. Water Resources* (1977) 69 Cal.App.3d 798, 833 [138 Cal.Rptr. 478], cert. den. 434 U.S. 985 [54 L.Ed.2d 479, 98 S.Ct. 612].) This covenant developed in the contract arena and is aimed at making effective a contract's promises. (*Foley* v. *Interactive Data Corp., supra*, at p. 683.) An alleged breach of the implied covenant of good faith and fair dealing is an allegation of breach of contract and arises out of the contract itself. (*Id.*, at p. 690.) In an employment contract, the breach of this covenant gives rise to contract

---

[5] In its reply brief, Southern Pacific cites three cases in which federal courts have rejected the application of *Lingle*'s holding to drug testing when the plaintiffs alleged a violation of a right to privacy under state law. However, each of these cases is distinguishable from *Lingle* and from our case because resolution of the underlying issue in each case depended on interpretation of a collective bargaining agreement. (See *Laws* v. *Calmat* (9th Cir. 1988) 852 F.2d 430, 431; *Utility Workers of America* v. *Southern Cal. Edison* (9th Cir. 1988) 852 F.2d 1083, 1085-1086, cert. den. 489 U.S. 1078 [103 L.Ed.2d 835, 109 S.Ct. 1530]; see also *Jackson* v. *Liquid Carbonic Corp.* (1st Cir. 1988) 863 F.2d 111, 114-115, cert. den. 490 U.S. 1107 [104 L.Ed.2d 1021, 109 S.Ct. 3158].)

damages only; tort remedies are not available. (*Id.*, at pp. 696, 700; see *Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 975-976 [258 Cal.Rptr. 592, 772 P.2d 1059].[6] Therefore, the jury's award of compensatory damages cannot be upheld on the basis of a tortious breach of the implied covenant of good faith and fair dealing.

## B. *Cause of Action in Contract*

■ A determination of whether the cause of action was properly submitted to the jury on a contract theory is a more complicated question. In general, Luck contends that Southern Pacific's act of terminating her for exercising her state constitutional right of privacy by refusing to submit to urinalysis constituted termination without good cause, and was therefore in bad faith. (See Cal. Const., art. I, § 1.) Southern Pacific counters that it had the right to terminate Luck without good cause but that if good cause was required, her refusal to submit to urinalysis constituted good cause.

### 1. *Underlying Contract*

First, Southern Pacific contends that there was no contract from which to imply a covenant of good faith and fair dealing. The employer argues that Luck was an "at will" employee who could be terminated without good cause and that, therefore, the cause of action for breach of the implied covenant of good faith and fair dealing should never have gone to the jury. The jury was instructed that in order to find a breach of the implied covenant of good faith and fair dealing, it must first find that an underlying contract of employment existed. The jury found that the employer breached the covenant. While the jury issued a special verdict, its verdict on whether there was a breach of the covenant was a general one. ■ A general verdict implies a finding in favor of every fact essential to support it. (*Plyer* v. *Pacific etc. Cement Co.* (1907) 152 Cal. 125, 130 [92 P. 56]; see 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 319, p. 320.) Therefore, the jury impliedly found that a contract existed.

On appeal, Southern Pacific argues that the breach of covenant issue should never have gone to the jury because the question of whether a contract existed is a question of law, not one of fact.[7] ■ Under Labor

---

[6] *Foley* v. *Interactive Data Corp.*, *supra*, is fully retroactive, applying to all cases not final as of its final date, January 30, 1989. (*Newman* v. *Emerson Radio Corp.*, *supra*, 48 Cal.3d at pp. 976, 993.) This is such a case.

[7] Luck argues that any error in submitting this cause of action was invited when Southern Pacific agreed to submit it to the jury. A review of the record leads us to conclude otherwise. Southern Pacific's motion for directed verdict urged that Luck had not established a breach of the implied covenant of good faith and fair dealing. This motion was filed with the trial

Code section 2922, an employment for an unspecified term may be terminated at the will of either party. However, the absence of an express written or oral contract term concerning termination of employment does not necessarily indicate that employment is actually intended by the parties to be "at will" pursuant to Labor Code section 2922, because the presumption of at-will employment may be rebutted by evidence of contrary intent. Generally, courts seek to enforce the actual understanding of the parties to a contract, and in so doing may inquire into the parties' conduct to determine if it demonstrates an implied contract. It must be determined, as a question of fact, whether the parties acted in such a manner as to provide the necessary foundation for an implied contract. (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at pp. 677, 680.)

The presumption of at-will employment may be overcome by evidence of an implied agreement that the employment would continue indefinitely, pending occurrence of some event such as the employer's dissatisfaction with the employee's services or the existence of some "cause" for termination. A number of factors are considered when ascertaining the existence and content of an employment agreement: consideration, any express contract terms, the employer's personnel policies and practices, the employee's longevity of service, the employer's actions or communications reflecting assurances of continued employment, and industry practices. (See *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at pp. 677, 680.)

The determination whether an implied contract not to terminate except for good cause exists is an issue of fact. (*Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at p. 677.) ▇ In Luck's case, there was sufficient evidence from which to conclude that such an implied contract existed. Luck had been employed by Southern Pacific for almost six and a half years at the time of termination. This length of service is sufficient for conduct to occur on which a finding of the existence of an implied contract not to terminate for other than good cause may be based. (See *id.*, at p. 681 [plaintiff employed for six years, nine months pleaded implied contract].)

---

court's clerk the same day that the case was submitted to the jury. As submission occurred late in the afternoon, we assume that the motion was filed before the case went to the jury. The motion was denied, as were later motions for judgment notwithstanding the verdict and for new trial raising the same argument.

Luck makes much of the fact that Southern Pacific's motion for nonsuit at the close of Luck's case-in-chief did not include a challenge to the implied covenant cause of action. In fact, the employer, when questioned by the court on this omission in chambers, indicated that it thought that this cause of action should go to the jury on a factual issue. Apparently, it abandoned this position later in the trial, after it had presented its case. In light of the employer's otherwise consistent arguments that Luck had not stated a cause of action for breach of the implied covenant, we do not find this an appropriate case in which to apply the invited error doctrine.

Luck was promoted to a nonunion position after two years. She received grade and salary increases and was repeatedly complimented on the high quality of her work during her term of employment. These factors contribute to a reasonable expectation that she would not be terminated except for good cause. (See *ibid.* [plaintiff pleaded facts sufficient for jury to find implied-in-fact contract].) Therefore, the jury's implied finding that a contract existed is supported by substantial evidence. (See *id.*, at p. 682.) As the statutory presumption that Luck was an at-will employee was overcome by evidence of an implied contract, Southern Pacific was required to show good cause for her termination.

2. *Bad Faith—Exercise of Privacy Right*

 a. *Privacy Interests*

■ Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." By this provision, California accords privacy the constitutional status of an inalienable right, on a par with defending life and possessing property. (*Vinson* v. *Superior Court* (1987) 43 Cal.3d 833, 841 [239 Cal.Rptr. 292, 740 P.2d 404] [limiting right to discover one's sexual history, habits and practices in action for sexual harassment and emotional distress].) ■ The validity of the jury's finding of bad faith turns on whether Luck had a constitutional right to privacy allowing her to refuse to submit to urinalysis.

Division Three of this District has recently held that the collection and testing of urine intrudes upon reasonable expectations of privacy. (*Wilkinson* v. *Times Mirror Corp.* (1989) 215 Cal.App.3d 1034, 1048 [264 Cal.Rptr. 194].) This finding is consistent with that of the United States Supreme Court, which held that both the collection of a urine sample and its testing involve privacy interests and therefore constitute searches within the meaning of the Fourth Amendment. The "chemical analysis of urine . . . can reveal a host of private medical facts about an employee, including whether she is epileptic, pregnant, or diabetic. Nor can it be disputed that the process of collecting the sample to be tested, which may in some cases involve visual or aural monitoring of the act of urination, itself implicates privacy interests. As the Court of Appeals for the Fifth Circuit has stated: [¶] 'There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as

social custom.' [Citation.] [¶] [I]t is clear that *the collection and testing* of urine intrudes upon expectations of privacy that society has long recognized as reasonable . . . ." (*Skinner* v. *Railway Labor Exec. Assn.* (1989) 489 U.S. 602, 617 [103 L.Ed.2d 639, 659-660, 109 S.Ct. 1402], italics added; see *Harmon* v. *Thornburgh* (D.C. Cir. 1989) 878 F.2d 484, 487 [278 App.D.C. 382], cert. den. *sub nom., Bell* v. *Thornburgh* __ U.S. __ [107 L.Ed.2d 949]; *Wilkinson* v. *Times Mirror Corp., supra*, 215 Cal.App.3d at p. 1044.)[8] The California Supreme Court has also held that the taking of a urine sample invokes "privacy and dignitary interests protected by the due process and search and seizure clauses." (*People* v. *Melton* (1988) 44 Cal.3d 713, 739, fn. 7 [244 Cal.Rptr. 867, 750 P.2d 741], cert. den. 488 U.S. 934 [102 L.Ed.2d 346, 109 S.Ct. 329].) Therefore, we are satisfied that urinalysis intrudes upon reasonable expectations of privacy. (See *Wilkinson* v. *Times Mirror Corp., supra*, at p. 1048.)

Nevertheless, Southern Pacific contends that the state constitutional right to privacy (Cal. Const., art. I, § 1) does not apply to urinalysis. The constitutional amendment adopted in 1972 made explicit the right to privacy. (*White* v. *Davis* (1975) 13 Cal.3d 757, 773 [120 Cal.Rptr. 94, 533 P.2d 222]; see *Alarcon* v. *Murphy* (1988) 201 Cal.App.3d 1, 5 [248 Cal.Rptr. 26].) The "principal 'mischiefs' " at which the constitutional amendment was directed were the uncontrolled collection and use of personal information by government and business. (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 212-213 [211 Cal.Rptr. 398, 695 P.2d 695]; *White* v. *Davis, supra*, at p. 775.) Southern Pacific contends that the informational protection described in *White* is the only protection that article I, section 1 provides.[9] "However, the right to privacy has been held to protect a diverse range of personal freedoms." (*Robbins* v. *Superior Court, supra*, 38 Cal.3d at p. 213; *White* v. *Davis, supra*, at pp. 773-774, 774, fn. 10; see, e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 262 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118] [right of procreative choice]; *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127, 1137 [225 Cal.Rptr. 297] [right to refuse medical treatment].) The "constitutional right of privacy guaran-

---

[8] "Urinalysis [is a] search[ ]. [Citations.] [It] compromise[s] legitimate expectations of privacy in two distinct ways. [First,] [t]he taking of the [urine sample] intrudes physically upon the integrity of one's body and its functions. [Citations.] Although it is a waste product, urine is discharged privately. A reasonable person would not expect '. . . members of the public' to [inspect] one's urine. . . . [Citations.] Second, [the] analysis. . . . exposes to the government and public private facts about one's life." (*Amalgamated Transit U.* v. *Cambria Cty. Tr. Auth.* (W.D.Pa. 1988) 691 F.Supp. 898, 902.)

[9] Southern Pacific's argument assumes that Luck has no right to informational privacy involved in urinalysis. As the *testing* of urine to determine the presence of drugs constitutes a search for information, the validity of this assumption is suspect. However, we address the merits of the claim.

tees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity." (*Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220] [right to refuse medical treatment].)

Before 1972, California courts had found a state and federal constitutional right to privacy even though such a right was not enumerated in either constitution, and had consistently given a broad reading to the right to privacy. (*Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212, 234 [157 Cal.Rptr. 117]; see *People* v. *Porras* (1979) 99 Cal.App.3d 874, 879 [160 Cal.Rptr. 627].) The elevation of the right of privacy to constitutional stature was intended to expand, not contract, privacy rights. (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 829 [134 Cal.Rptr. 839]; see *People* v. *Porras, supra*, 99 Cal.App.3d at p. 879.) The Supreme Court has held that polygraph examinations inherently intrude on an employee's right to privacy under article I, section 1. (*Long Beach City Employees Assn.* v. *City of Long Beach* (1986) 41 Cal.3d 937, 943-948 [227 Cal.Rptr. 90, 719 P.2d 660].) As freedom from polygraph examination is a protected privacy interest, it seems reasonable to infer that our Supreme Court, like the United States Supreme Court in the Fourth Amendment context, would find both the collection and testing of urine to be privacy interests protected by article I, section 1.

b. *Private Employer*

■■■■■ Next, Southern Pacific argues that, as a private employer, it was not required to observe the privacy guarantee of article I, section 1.[10] The trial court denied its motion for directed verdict, urged on the ground that the constitutional right to privacy did not prohibit a private employer's invasions of privacy. Article I, section 1 of the California Constitution does not specify whether its privacy provisions are limited to

---

[10] This argument is raised for the first time in Southern Pacific's reply brief; its opening brief assumed that the right to privacy could be asserted against a private employer. Normally, we do not address new issues raised for the first time in a reply brief on fairness grounds, as this deprives the respondent of an opportunity to respond to the new claims. (*Smith* v. *Board of Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 329, fn. 5 [248 Cal.Rptr. 704] [right to privacy].) However, Luck has had the opportunity to respond by letter brief. Also, Southern Pacific's analysis of *Schmidt* v. *Superior Court* (1989) 48 Cal 3d 370 [256 Cal.Rptr. 750, 769 P.2d 932], could not have been made earlier, as that decision had not been announced at the time that the opening brief was filed in 1988.

Southern Pacific did not raise this contention at trial, either. However, a party may advance a new theory on appeal when the issue is a question of law based on undisputed facts and involves an important question of public policy. (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654-655, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261], affd. (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045].) Given the importance of the issue in this case, we find it appropriate for us to resolve its merits.

state action. However, Division Three of this District has recently held in a urinalysis case that article I, section 1 was intended to reach both governmental and nongovernmental conduct. (*Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d at pp. 1041-1043.) This finding is consistent with previous case law. Those cases held that the principal aim of the constitutional provision was to limit the infringement on personal privacy arising from government activity. (*White* v. *Davis, supra,* 13 Cal.3d at p. 761.) However, the California Supreme Court has assumed that it limits business as well as government activity, based on an analysis of the ballot arguments in support of the privacy amendment. (*Id.,* at p. 774; see *Wilkinson* v. *Times Mirror Corp., supra,* at p. 1040.) Appellate courts have repeatedly held that the right to privacy is an inalienable right which no one may violate. (*Wilkinson* v. *Times Mirror Corp., supra,* at pp. 1041-1043 [private potential employer]; *Porten* v. *University of San Francisco, supra,* 64 Cal.App.3d at p. 829 [private university]; see *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087, 1093-1094 [266 Cal.Rptr. 280] [private employer; allegation of state action not required to overcome demurrer to cause of action based on constitutional right to privacy]; *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816, 851 [182 Cal.Rptr. 813] [dicta], app. dism. 459 U.S. 1192 [75 L.Ed.2d 422, 103 S.Ct. 1170]; *Kinsey* v. *Macur* (1980) 107 Cal.App.3d 265, 272 [165 Cal.Rptr. 608] [individual]; see also *Annenberg* v. *Southern Cal. Dist. Council of Laborers* (1974) 38 Cal.App.3d 637, 645-646 [113 Cal.Rptr. 519] [labor union].) Commentators have also espoused this view. (See, e.g., Note, *Your Urine or Your Job: Is Private Employee Drug Urinalysis Constitutional in California?* (1986) 19 Loyola L.A. L.Rev. 1451, 1482-1483; see also Comment, *Mandatory Drug Testing of College Athletes: Are Athletes Being Denied Their Constitutional Rights?* (1988) 16 Pepperdine L.Rev. 45, 58, fn. 129; Decker, Employee Privacy Law and Practice (1987) §§ 3.10-3.11, 7.9, pp. 130-132, 292.)

Southern Pacific argues that the California Supreme Court has recently suggested that article I, section 1 does not bar private action. In *Schmidt* v. *Superior Court, supra,* 48 Cal.3d 370, the high court ruled that statutes permitting age restrictions to be placed on mobilehome park residency were not unconstitutional on familial privacy or equal protection grounds. (*Id.,* at pp. 389-390.) The court added a footnote: "In this regard, plaintiffs rely on a number of lower court cases which—in quite distinct factual contexts—have found that the state constitutional privacy provision applies to private as well as to state conduct. (See, e.g., *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839] [private university's alleged dissemination of information from student application for unauthorized purposes]; *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190 [private medical association's alleged

interference with health center patients' exercise of reproductive rights].) Because we conclude that the rule at issue here would not be unconstitutional even if the state action requirement were met, we have no occasion in this case to consider under what circumstances, if any, purely private action by a property owner or landlord would constitute a violation of the state constitutional privacy provision." (*Id.*, at p. 389, fn. 14.)

We are not persuaded that this footnote alters the existing law of this state, for several reasons. First, the privacy issue presented in *Schmidt*—whether an age restriction in a mobilehome park infringes on a privacy right—is, as that court stated, factually distinguishable from that presented in *Porten* and *Chico*, in which the privacy interests at stake were informational and substantive, respectively. Luck's privacy interests were also substantive and informational, and thus more akin to those in *Porten* and *Chico* than in that presented in *Schmidt.* Put another way, the interests at stake in *Schmidt* were property interests which might not be found to come within the privacy protection, regardless of who violated them; those at stake in *Porten, Chico,* and in Luck's case are more personal, involving what lay persons believe come within a zone of privacy. Second, the footnote itself is inconclusive—the high court expressly declined to rule on the question of whether private action would constitute a violation of privacy. Such references are tentative at best and, if anything, highlight the fact that the question remains to be decided by that court. (*Newman v. Emerson Radio Corp., supra,* 48 Cal.3d 973, 988.) Third, even if the footnote means what Southern Pacific suggests that it does, it is dicta. Fourth, the ballot argument supporting the adoption of the privacy amendment expressly states that it was intended to apply to prevent government and business violations of privacy. (See *White v. Davis, supra,* 13 Cal.3d at pp. 774-775; see *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 791-793, fn. 15 [195 Cal.Rptr. 393].) *Schmidt* provides us too slim a basis to ignore the accepted principle of existing law that the right to privacy limits private as well as state action. (See, e.g., *Semore v. Pool, supra,* 217 Cal.App.3d at p. 1094 [*Schmidt* has not decided this issue].) Therefore, we find that a private employer is bound by the terms of the privacy provisions of article I, section 1. (*Wilkinson v. Times Mirror Corp., supra,* 215 Cal.App.3d at pp. 1041-1043 [private employer]; *Porten v. University of San Francisco, supra,* 64 Cal.App.3d at p. 829 [private university].)[11]

---

[11] Luck also argues that, regardless of whether state action is required, Southern Pacific is not a private employer because the railroad industry is heavily regulated by the federal government. While there is extensive governmental regulation of the railroad industry in general and Southern Pacific in particular, this argument does not persuade us. Luck's position was not regulated, nor was the urinalysis required by or conducted in accordance with any federal regulations that apply to her. (Compare *Skinner v. Railway Labor Exec. Assn., supra,* 489 U.S. at pp. 606-612, 619-621 [103 L.Ed.2d at pp. 653-656, 661-663] [operating employees working on or around rail rolling stock came within Federal Railroad Administration regula-

### c. Public Interests

■■■ Next, Southern Pacific contends that even if the right to privacy prohibits employee urinalysis, such testing was justified under the facts of this case. The constitutional right to privacy does not prohibit all incursion into individual privacy, but provides that any such intervention must be justified by a compelling interest. (*White* v. *Davis, supra*, 13 Cal.3d at p. 775; *Alarcon* v. *Murphy, supra*, 201 Cal.App.3d at p. 5; see *Long Beach City Employees Assn.* v. *City of Long Beach, supra*, 41 Cal.3d at p. 948.) This test places a heavier burden on Southern Pacific than would a Fourth Amendment privacy analysis, in which the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. (Compare *Skinner* v. *Railway Labor Exec. Assn., supra*, 489 U.S. at p. 619 [103 L.Ed.2d at p. 661]; *Treasury Employees* v. *Von Raab* (1989) 489 U.S. 656, 665-666 [103 L.Ed.2d 685, 702, 109 S.Ct. 1384]; *White* v. *Davis, supra*, 13 Cal.3d at p. 775.)[12] Although Southern Pacific urges us to use the Fourth Amendment test, we see no reason to depart from existing precedent applying the compelling interest test in cases arising under article I, section 1 of the state Constitution.[13]

---

tions].) Therefore, for purposes of Luck's cause of action for damages against her employer, Southern Pacific is more akin to a private employer than to a public employer.

[12] Southern Pacific suggests that the recent United States Supreme Court cases are not applicable, because Luck's case involves random testing and the federal cases do not. Faced with a similar suggestion challenging the application of *Skinner* and *Von Raab* to a random urinalysis test, a federal court of appeal has held that, while the random nature of urinalysis testing is a relevant consideration, it does not require a fundamentally different analysis from that taken by the Supreme Court. (*National Federation of Federal Employees* v. *Cheney* (D.C. Cir. 1989) 884 F.2d 603, 608-609, cert. den. __ U.S. __ [107 L.Ed.2d 948]; see *American Federation of Gov. Employees* v. *Skinner* (D.C. Cir. 1989) 885 F.2d 884, 891.) In like manner, we are satisfied that the United States Supreme Court cases and their progeny are persuasive authority in Luck's case, although we recognize the different balancing test used pursuant to article I, section 1, as opposed to the Fourth Amendment analysis used in federal cases.

[13] Division Three has held that justification by a compelling interest is not required if the right to privacy is not substantially burdened or affected by the intrusion. (*Wilkinson* v. *Times Mirror Corp., supra*, 215 Cal.App.3d at p. 1047.) In that case, the court applied a reasonableness test, rather than the compelling interest test, to a case involving a job applicant who was required to submit to urinalysis as a condition of an offer of employment from a private employer. However, *Wilkinson* noted that its plaintiffs were applicants for employment rather than existing employees, and that it did not consider the issues presented in Luck's case—"the constitutionality of a private employer's drug testing of its employees, or the effect of a private employee's consent to drug testing under the threat of loss of employment." (*Id.*, at pp. 1048, 1050, fn. 9.) As Luck was a Southern Pacific employee, rather than a job applicant, we are satisfied that the termination of her employment was a sufficient burden on her right to privacy to merit application of the compelling interest test. (See, e.g., Decker, Employee Privacy Law and Practice, *supra*, § 7.9, p. 300 [employers have greater latitude with job applicants than with employees].)

Having determined that the compelling interest test applies, we must next determine what, if any, compelling interests Southern Pacific established that could be balanced against Luck's privacy interest. (See *White* v. *Davis, supra,* 13 Cal.3d at p. 775.) At trial and on appeal, Southern Pacific argued that its interest in safety justified the invasion of Luck's privacy interest. From 1981 until her 1985 termination, Luck worked at a computer terminal each day. She wore no safety equipment; high heels and a dress were her normal attire. Her job called for her to travel in order to install computers at other sites. Luck testified that in her last four years as a computer operator with Southern Pacific, she had nothing to do with the actual operation of trains and no responsibility for the operation of railroad equipment. A Southern Pacific official testified that at the time of her termination, Luck had no public safety duties.

The trial court found that the testing program, as applied to all exempt (nonunion) Southern Pacific employees, did not necessarily violate the employees' right to privacy without justification. It determined, as a matter of law, that there was a compelling public interest in rail safety and that testing was justified in the railroad industry because of its drug-related problems, but that the jury should determine whether it was necessary to require Luck to submit to urinalysis in order to promote safety. The jury found this was not necessary, impliedly finding that Luck did not hold a safety position. After the verdict was returned, the trial court noted that if its decision to submit this issue to the jury was erroneous—if it presented an issue of law rather than one of fact—it found as a matter of law that "requiring the plaintiff to produce a sample as a condition of employment, given her particular job obligations and duties" was a violation of public policy. Implied in this ruling is the trial court's finding that, as a matter of law, Southern Pacific did not have a sufficient interest in railroad safety to justify the intrusion into Luck's privacy interest represented by urinalysis.

■ Was Luck a safety employee? No court has determined whether this question presents an issue of law or of fact. When, as here, there is no factual dispute about the nature of the employee's work—only whether that work was safety-related—the issue seems to be one of law for the court. Although the court therefore erred by submitting this issue to the jury, the error was harmless. The trial court's ruling was consistent with the jury's verdict that Luck was not a safety employee, making that verdict merely advisory.

■ Next, we must determine whether, as a matter of law, Luck was a safety employee. Again, we have no case law addressing this specific issue. However, federal courts considering safety issues in Fourth Amendment privacy cases provide persuasive authority. The government's interest in

regulating the conduct of railroad employees to ensure safety presents special needs beyond normal law enforcement that may justify urinalysis under the Fourth Amendment. (See *Skinner* v. *Railway Labor Exec. Assn., supra,* 489 U.S. at pp. 619-620, 629-630 [103 L.Ed.2d at pp. 661-662, 668] [railroad employees involved in train movements and operations, or maintenance and repair of signal systems; operators recently involved in railway accident].) However, Luck is not a railroad operating employee working on or around rail rolling stock. (See *id.,* at p. 653 [upholding drug-testing regulations applying to railroad employees subject to the federal Hours of Service Act (45 U.S.C. § 61(b)(2)), defined as those actually engaged in or connected with the movement of any train].) Her work is not akin to that of persons who have routine access to dangerous nuclear power facilities, nor of a customs official directly involved in drug interdiction, nor of an employee required to carry a firearm. (See *Skinner* v. *Railway Labor Exec. Assn., supra,* at p. 628 [103 L.Ed.2d at p. 667]; *Treasury Employees* v. *Von Raab, supra,* 489 U.S. at p. 656 [103 L.Ed.2d at p. 709].)[14]

In determining the existence of a safety interest, federal courts distinguish between unsupervised employees who work in the field and employees who

---

[14]For example, in the Fourth Amendment context, federal courts have upheld urinalysis testing of air traffic controllers, pilots, aviation mechanics, and flight attendants; drug counselors; Army-employed civilian police and guards (*National Federation of Federal Employees* v. *Cheney, supra,* 884 F.2d at pp. 610-615); civilian employees of chemical weapons plant who have access to areas in which experiments are performed (*Thomson* v. *Marsh* (4th Cir. 1989) 884 F.2d 113, 114-115); drivers of and attendants on school buses for handicapped children (*Jones* v. *Jenkins* (D.C. Cir. 1989) 878 F.2d 1476, 1477); employees holding top secret national security clearances (*Harmon* v. *Thornburgh, supra,* 878 F.2d at pp. 491-492); railway and highway safety inspectors; lock and dam operators; vessel traffic controllers; hazardous material inspectors; aircraft mechanics; motor vehicle operators holding security clearances (*American Federation of Gov. Employees* v. *Skinner, supra,* 885 F.2d at pp. 890-893); county correctional employees with regular access to prisoners and weapons (*Taylor* v. *O'Grady* (7th Cir. 1989) 888 F.2d 1189, 1199, 1201); and sworn and civilian police personnel who carry firearms or participate in drug interdiction efforts (*Guiney* v. *Roache* (1st Cir. 1989) 873 F.2d 1557, 1558, U.S. app. pending.) These courts have found insufficient governmental interests to uphold urinalysis testing of criminal prosecutors and Justice Department employees with access to grand jury proceedings (*Harmon* v. *Thornburgh, supra,* at pp. 490-492), and county correctional employees who have no reasonable opportunity to smuggle narcotics to prisoners (*Taylor* v. *O'Grady, supra,* at pp. 1199, 1201). Federal courts have questioned the propriety of random testing of secretaries, engineering technicians, research biologists, and animal caretakers who work at chemical and nuclear surety facilities (*National Federation of Federal Employees* v. *Cheney, supra,* at pp. 611-612 [remand for further proceedings]; civilian lab technicians at Army drug-testing laboratories and employees in the chain of custody of biochemical testing (*id.,* at p. 614 [clear, direct nexus required between employee duties and nature of feared harm, and compelling reason to expect drug use will result in misplaced sympathies for responsibilities]); and police department personnel who do not carry firearms or participate in drug interdiction efforts. (*Guiney* v. *Roache, supra,* at p. 1558 [remand].) These courts have not yet determined whether categories of persons who handle classified material may be overly inclusive. (See *Treasury Employees* v. *Von Raab, supra,* 489 U.S. at pp. 677-678 [103 L.Ed.2d at pp. 709-710]; *National Treasury Employees Union* v. *Von Raab* (5th Cir. 1989) 876 F.2d 376, 376 [remand to district court].)

work in a traditional office environment where drug use may be more easily detected. (See *National Federation of Federal Employees* v. *Cheney, supra,* 884 F.2d at p. 614; see *Treasury Employees* v. *Von Raab, supra,* 489 U.S. at p. 674 [103 L.Ed.2d at p. 707]; see also *American Federation of Gov. Employees* v. *Skinner, supra,* 885 F.2d at p. 893; *Harmon* v. *Thornburgh, supra,* 878 F.2d at pp. 491-492.) To paraphrase a recent federal court decision prohibiting drug testing of Justice Department office workers, a blunder by a computer operator in a railroad's engineering department may lead, through a chain of ensuing circumstances, to a threat to public safety. However, that sort of indirect risk is "wholly different from the risk posed by a worker who carries a gun or operates a train." The safety rationale adopted by the Supreme Court in *Skinner* and *Von Raab* focused on the immediacy of the threat. The point was that "a single slip-up by a gun-carrying agent or a train engineer may have irremediable consequences; the employee . . . will have no chance to recognize and rectify [a] mistake, nor will other . . . personnel have an opportunity to intervene before the harm occurs." (*Harmon* v. *Thornburgh, supra,* 878 F.2d at p. 491.) *Skinner* and *Von Raab* provide no basis for finding that an office employee constitutes a safety risk when the chain of causation between misconduct and injury is greatly attenuated.

While railroads clearly have an interest in the safe operation of their trains, it is not clear that testing Luck furthered this interest. When an employer asserts an interest that is not obviously applicable to the specific employee in question, federal decisions applying *Skinner* and *Von Raab* have held that testing cannot be upheld absent a clear, direct nexus between the employee's duties and the nature of the feared harm. (See *National Federation of Federal Employees* v. *Cheney, supra,* 884 F.2d at p. 614; *Harmon* v. *Thornburgh, supra,* 878 F.2d at p. 490.) Here, Southern Pacific suggested only indirect, potential safety ramifications that might result from an imprudent decision that an employee working as Luck did might make if her judgment were impaired by drugs. Under the federal authorities, Luck's job did not have sufficient safety aspects to constitute a safety interest that might be balanced against the intrusion upon her privacy rights. When we also consider that the interest must be compelling in order to justify an intrusion of her privacy rights under our state Constitution—a higher showing than would be required under the Fourth Amendment analysis used by federal courts—it is clear that the trial court's implied ruling that Southern Pacific's safety interest did not justify the invasion of Luck's privacy was correct.

Southern Pacific also contends that other, nonsafety interests justified the testing: deterrence, efficiency, competence, creating a drug-free environment, enforcing rules against drug use, and ensuring public confidence in

the integrity of the railroad industry. The trial court ruled that these interests were not compelling. On appeal, the employer contends that the trial court erred in precluding it from presenting these other interests to the jury.

In a railroad context, proper drug-testing regulations have been justified by the goal of preventing railroad operation accidents and casualties resulting from drug impairment. (*Skinner* v. *Railway Labor Exec. Assn., supra,* 489 U.S. at pp. 620-621 [103 L.Ed.2d at p. 662].) As Southern Pacific points out, safety is not the only possible employer interest that might be placed on the scale to balance against the employee's privacy right in order to determine whether urinalysis was justified. (See *Treasury Employees* v. *Von Raab, supra,* 489 U.S. at pp. 665-666 [103 L.Ed.2d at p. 702] [Customs Service testing to deter drug use among those eligible for promotion to sensitive positions and to prevent the promotion of drug users to those positions promotes substantial governmental interest]; *National Federation of Federal Employees* v. *Cheney, supra,* 884 F.2d at pp. 614-615 [drug counselors may be tested to ensure their allegiance to their "mission"].) However, the trial court correctly ruled that none of the nonsafety interests asserted at trial are compelling. Even under the lower federal standard, workers may not be compelled to submit to urinalysis unless "a clear, direct nexus exists between the nature of the employee's duty and the nature of the feared violation." (*Harmon* v. *Thornburgh, supra,* 878 F.2d at p. 490.) Southern Pacific has not articulated any clear, direct nexus in relation to any of the interests it suggests justify the testing. If these interests are not justifiable under the less stringent Fourth Amendment test, a fortiori, they cannot constitute compelling interests under article I, section 1 of the California Constitution. (See *Central Valley Chap. 7th Step Foundation* v. *Younger, supra,* 95 Cal.App.3d 212, 238 [administrative burden was not compelling state interest]; see also *Harmon* v. *Thornburgh, supra,* at pp. 490-491 [maintaining work force integrity does not justify urinalysis testing of federal prosecutors or workers with access to grand jury proceedings].) The trial court correctly ruled that Southern Pacific's other proffered justifications were not compelling. As Southern Pacific did not establish any compelling interest that might justify an intrusion of Luck's privacy rights, that intrusion was unjustified.[15]

### d. *Consent*

Southern Pacific also contends that Luck expressly consented to the testing. In 1979, she agreed to take a physical examination at the time

---

[15] In light of this holding, we need not address the question of whether the means chosen to achieve a compelling interest must be the least intrusive means, nor need we consider what effect—if any—the use of random testing rather than trigger testing would have on the weighing process.

that she was hired, including a test for detection of narcotic drug usage. She signed a consent form, agreeing to let Southern Pacific doctors examine her as "often as the company may deem necessary." Luck testified that she interpreted the release form to mean that she permitted her new employer could determine if she was initially able to perform her job duties; if Southern Pacific noticed a problem that would make her unable to perform her job, she would permit a doctor to check that further. No one at Southern Pacific advised her that by signing the consent to the entry physical that she was consenting to any and all future tests that her employer might deem necessary. When it instructed Luck to submit to urinalysis in 1985, Southern Pacific required its employees to sign a separate consent form. The trial court found the preemployment consent form to be ambiguous when denying Southern Pacific's motion for nonsuit urged on the basis of consent. Motions for directed verdict and for new trial were also denied on similar grounds.

We agree with the trial court that the language of the contract is ambiguous about whether Luck's consent applied after the preemployment physical examination process was complete. The jury was instructed on the issue of consent. By its verdict in Luck's favor, the jury impliedly found that she did not consent to urinalysis. (See *Plyer* v. *Pacific etc. Cement Co., supra,* 152 Cal. 125, 130; see also 7 Witkin, Cal. Procedure, *supra,* § 319, p. 320.) Waiver of a contractual right is ordinarily a question of fact. As Luck's testimony constituted substantial evidence to support the finding of lack of consent, we are bound on appeal by this determination. (See *Rubin* v. *Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 [205 Cal.Rptr. 455].)

Southern Pacific also suggests that Luck impliedly consented to urinalysis when she went to work in a regulated industry. This argument is based on the premise that all railroad employees, even those who work in nonregulated positions, are regulated employees—a premise we have already rejected. While a regulated employee may have a reduced expectation of privacy (see *Skinner* v. *Railway Labor Exec. Assn., supra,* 489 U.S. at p. 627 [103 L.Ed.2d at p. 666] [railroad operating employees]; *Treasury Employees* v. *Von Raab, supra,* 489 U.S. at p. 672 [103 L.Ed.2d at p. 706] [drug interdiction officials; customs officials carrying firearms]), we have already determined that Luck was not employed in a regulated position. (See pt. c., *ante.*) Therefore, Luck did not impliedly consent to urinalysis by virtue of her railroad employment.

e. *Bad Faith*

Finally, Southern Pacific contends that it did not act in bad faith when it terminated Luck. In essence, the employer argues that even if Luck

had a constitutional right to refuse to submit to urinalysis, it had an honest, good faith belief that it had good cause to terminate her in 1985. The reason for an employee's dismissal and whether that reason constitutes bad faith are evidentiary questions most properly resolved by the trier of fact. (*Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 263 [215 Cal.Rptr. 860]; see 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 177, pp. 172-174.) The reason for Luck's dismissal is not disputed: Southern Pacific admitted that her termination was solely the result of her failure to submit to urinalysis. The jury was instructed that the neglect or refusal to fulfill a contractual obligation based on an honest, mistaken belief did not constitute a breach of the implied covenant. We must assume that the jury followed this instruction. (*People* v. *Bruce* (1989) 208 Cal.App.3d 1099, 1106 [256 Cal.Rptr. 647].) The jury found that Luck's termination was in bad faith. On appeal, our inquiry is limited to whether there is substantial evidence in the record to support this finding of bad faith. (*Khanna* v. *Microdata Corp., supra*, at p. 263.) Southern Pacific's invasion of Luck's privacy was unjustified. (See pt. c., *ante*.) The jury impliedly found that Luck was terminated for exercising her constitutional right to privacy. The jury heard evidence from which it could conclude that Southern Pacific promised Luck a pretermination hearing—before which Luck intended to seek injunctive relief, if necessary, to prevent her termination—and agreed to continue her insurance coverage during an interim period, but did not keep these promises. This evidence provides substantial evidence to support the jury's finding that Southern Pacific acted in bad faith.

### f. *Conclusion*

The jury's verdict that Southern Pacific committed a contractual breach of its implied covenant of good faith and fair dealing by terminating Luck for refusing to submit to urinalysis was proper. This finding of liability supports the award of economic damages, although it cannot support an award of tort damages. (See *Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654, 696, 700.)[16]

## IV. VIOLATION OF PUBLIC POLICY

■ Southern Pacific challenges the trial court's decision to submit Luck's cause of action for wrongful termination in violation of public policy to the jury. The trial court denied Southern Pacific's motions for directed

---

[16] "The difficult and delicate task of balancing the privacy rights of job applicants and employees against the legitimate business and safety concerns of private employers involves policy determinations which are peculiarly within the purview of the Legislature, and we urge that body to recognize and act on its obligation to provide guidance in this much debated area." (*Wilkinson* v. *Times Mirror Corp., supra*, 215 Cal.App.3d at p. 1052, fn. omitted.)

verdict, new trial, and judgment notwithstanding the verdict challenging this cause of action and the jury's ultimate verdict on it. On appeal, Southern Pacific argues that Luck did not establish a case for wrongful termination.[17]

Since the time of trial, our Supreme Court has announced two major decisions on the field of wrongful termination. (See *Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654; see also *Newman* v. *Emerson Radio Corp., supra*, 48 Cal.3d 973.) These new cases reaffirm that an employer's right to terminate even an "at will" employee is subject to limits imposed by public policy, to prevent the threat of termination from resulting in actions taken which are harmful to the public. (*Foley* v. *Interactive Data Corp., supra*, at p. 665; see *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) One who has been wrongfully terminated from employment may seek tort damages based on a claim that he or she was terminated in violation of a fundamental public policy. (*Newman* v. *Emerson Radio Corp., supra*, at pp. 975-976; *Foley* v. *Interactive Data Corp., supra*, at p. 666; *Tameny* v. *Atlantic Richfield Co., supra*, at pp. 170, 174-176.) This tort is independent of the term of employment. (*Foley* v. *Interactive Data Corp., supra*, at pp. 666-667, 693, fn. 30.)

Southern Pacific argues that the alleged privacy right at issue in Luck's case is personal to every Californian, and that its violation does not involve public policy, but merely her individual rights. (See Cal. Const., art. I, § 1.) The trial court denied Southern Pacific's motion for nonsuit on this ground. Luck claims that to fire her for exercising her constitutional right to privacy is against public policy. (See *Tameny* v. *Atlantic Richfield Co., supra*, 27 Cal.3d at pp. 172-178.) The trial court agreed as a matter of law, although it permitted the issue to go to the jury. The jury also agreed that public policy rights had been violated.

No California appellate court has determined whether an employee's termination for refusal to submit to urinalysis as an exercise of one's constitutional right to privacy would constitute a violation of public policy for purposes of wrongful termination. However, the California Supreme Court

---

[17]Most of Southern Pacific's contentions on this issue appear for the first time in its reply brief. These arguments did not appear in its November 1988 opening brief, filed a month before *Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d 654. Generally, issues cannot be raised for the first time on appeal in a reply brief, as this deprives the respondent of an opportunity to respond to the new claims. (*Smith* v. *Board of Medical Quality Assurance, supra*, 202 Cal.App.3d at p. 329, fn. 5.) However, Luck addressed the *Foley* issues in her brief; the California Supreme Court has held *Foley* retroactive to cases such as this which are not yet final (see *Newman* v. *Emerson Radio Corp., supra*, 48 Cal.3d at pp. 976, 993); and Southern Pacific presented its *Foley* argument in as timely a fashion as possible after *Foley* was announced. Therefore, we will address the issues.

has given us guidelines to apply to determine whether, on particular facts, a cause of action for wrongful termination in violation of public policy might lie. A termination that is against public policy must affect a duty which inures to the benefit of the public at large rather than to a particular employer or employee. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at pp. 668-669.) Past cases recognizing a tort action for termination in violation of public policy seek to protect the public by protecting an employee who refused to commit a crime, reported criminal activity, or disclosed other illegal, unethical, or unsafe practices. (*Id.*, at p. 670.) However, even the reporting of improper conduct may not constitute a public policy interest; if, for example, an employee's duty to disclose information to his employer serves only the employer's private interest, the public policy rationale does not apply. (*Id.*, at pp. 670-671 [no violation of public policy when employee terminated after reporting that coworker was under criminal investigation].) The California Supreme Court explained that the absence of a distinctly public interest is apparent when we consider that if an employer and employee expressly agreed that the employee had no obligation to, and should not, inform the employer of any adverse information the employee learned about a coworker's background, no public policy would render the agreement void. If the employer and employee could have lawfully made such an agreement, *Foley* reasoned, it cannot be said that the employer, by discharging an employee on this basis, violated a fundamental duty imposed on all employers for the protection of the public interest. (*Id.*, at pp. 670-671, fn. 12.)

Measured against the *Foley* standard, Luck did not state a cause of action for wrongful termination in violation of public policy. The right to privacy is, by its very name, a private right, not a public one. The parties could have lawfully agreed that Luck would submit to urinalysis without violating any public interest. Such an agreement between Luck and Southern Pacific would not have been against public policy. (See, e.g., *Consolidated Rail* v. *Labor Executives, supra*, 491 U.S. 299 [105 L.Ed.2d 250] [no suggestion that drug testing would be improper term of collective bargaining agreement].) Therefore, under *Foley*, there was no violation of *public* policy.

Even if Luck's termination involved public policy interests, her attempt to state a cause of action for wrongful termination based on the violation of those policy interests would not satisfy other requirements set forth in *Foley*. According to the California Supreme Court, the public policy must be one about which reasonable persons can have little disagreement. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 668.) This case is part of an explosion of hotly contested employee urinalysis cases which should dispel any notion that reasonable persons have evolved a consensus about whether urinalysis testing is consistent with state and federal privacy protections.

Measured against this background, the issue of whether urinalysis and privacy rights involve *public* policy interests is one about which reasonable people may, and do, differ.

Finally, the public policy must also be one that was firmly established at the time of termination. (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 668.) Southern Pacific argues that at the time it instituted its employee testing program in 1985, there was no firmly established policy prohibiting urinalysis. The employer raised this issue in the trial court before *Foley* was announced, but its motion for nonsuit—based, in part, on the ground that no public policy against urinalysis existed at the time of Luck's termination—was denied. The United States Supreme Court did not hold that urinalysis of federal employees and regulated workers intruded upon privacy interests until April 1989. (See *Skinner* v. *Railway Labor Exec. Assn., supra,* 489 U.S. 602 [103 L.Ed.2d 639]; *Treasury Employees* v. *Von Raab, supra,* 489 U.S. 656 [103 L.Ed.2d 685].) The first California appellate decision to hold that article I, section 1 applied to private employers was not filed until November 1989. (See *Wilkinson* v. *Times Mirror Corp., supra,* 215 Cal.App.3d 1034.) The City of San Francisco did not ban urinalysis testing until after Luck was terminated in July 1985. (See fn. 1, *ante.*) Therefore, we must conclude that there was no firmly established public policy against urinalysis in 1985 because, at that time, our Constitution's privacy provision had not been interpreted as prohibiting this testing. For all these reasons, we hold that Luck did not state a cause of action for wrongful termination in violation of public policy.[18]

## V. Damages*

. . . . . . . . . . . . . . . . . . .

## VI. Attorney Fees

 In a separate appeal, Luck challenges the trial court's denial of her motion for attorney fees. On motion, a court may award attorney fees to a successful party against an opposing party in an action resulting in the enforcement of an important right affecting the public interest if a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the public; the necessity and financial burden of private enforcement are such as to make the award appropriate; and such fees should not, in the

---

[18] In light of this ruling, we need not determine Southern Pacific's challenge to the jury instructions on the cause of action for wrongful termination.

*See footnote, *ante,* page 1.

interest of justice, be paid out of the recovery. (Code Civ. Proc., § 1021.5.) Luck moved for nearly $300,000 in attorney fees after trial. The trial court held that she established that her action resulted in the enforcement of an important right affecting the public interest and that a significant benefit has been conferred on a large class of persons as a result of this decision. However, the trial court ruled that Luck did not establish that the necessity and financial burden of private enforcement made a fee award appropriate. The court reasoned that an award of attorney fees would be appropriate if it would encourage litigation of issues that would not otherwise be brought, absent the possibility of receiving attorney fees. It found that Luck's act of seeking substantial damages demonstrated a significant financial incentive for her to bring the underlying action, and that she had failed to establish that the litigation costs transcended her personal interest in the action. Although it denied her motion, the trial court noted the high quality of Luck's representation.

On appeal, Luck contends that the trial court applied the wrong standard when evaluating the merits of her motion. We disagree. The trial court considered the criteria set forth in the statute and found that one—that the necessity and financial burden of private enforcement make the award appropriate—did not exist. (See *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 934-935 [154 Cal.Rptr. 503, 593 P.2d 200].) The financial burden of private enforcement requirement means that an award of attorney fees under section 1021.5 of the Code of Civil Procedure is only appropriate when the cost of the claimant's legal victory transcends his or her personal interest—i.e., when the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his or her individual stake in the matter. (*Id.*, at p. 941.) The trial court specifically found that Luck did not establish this fact. This factor focuses not on Luck's abstract personal stake in the case, but on the financial incentives and burdens related to bringing suit. (See *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321, fn. 11 [193 Cal.Rptr. 900, 667 P.2d 704]; *California Common Cause* v. *Duffy* (1987) 200 Cal.App.3d 730, 751 [246 Cal.Rptr. 285].) Luck had the burden of proof on this issue. (See *Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 113 [212 Cal.Rptr. 485].) She did not show that the lawsuit placed a burden on her out of proportion to her individual interest in the matter. (See *Save Oxnard Shores* v. *California Coastal Com.* (1986) 179 Cal.App.3d 140, 154 [224 Cal.Rptr. 425]; *Beach Colony II* v. *California Coastal Com., supra*, at p. 113.) Therefore, the trial court did not abuse its discretion in denying the motion for attorney fees. (See *Schmid* v. *Lovette* (1984) 154 Cal.App.3d 466, 477 [201 Cal.Rptr. 424].)

Finally, Luck moves this court for attorney fees on appeal. However, Luck still has not satisfied the last prong of the statutory test—that the cost

of her legal victory transcends her personal interest in the case. As such, we exercise our discretion and deny her motion for attorney fees on appeal. (See Code Civ. Proc., § 1021.5.)

The judgment on the merits (case No. A040995) is affirmed. The trial court order denying attorney fees (case No. A042205) is affirmed. Luck's motion for attorney fees on appeal is denied. Luck is entitled to costs for the appeal on the merits (case No. A040995) and Southern Pacific is entitled to costs for the fee order appeal (case No. A042205), as the trial court shall fix them.

Perley, J., concurred.

**POCHÉ, Acting P. J.,** Concurring and Dissenting.—I dissent from the holding (part IV of the opinion) that an employer who seeks to burden the right of privacy of an employee may then fire the employee for resisting those efforts and avoid any tort liability for the firing.

The question is whether Barbara Luck stated and proved a cause of action for wrongful discharge in violation of public policy. What she stated and proved to the jury's satisfaction is that she was fired for insisting upon her right of privacy. Nevertheless the majority concludes that even though her privacy rights were unlawfully impaired, she has no claim in tort for the company's conduct because (1) public policy was not involved ("The right to privacy is, by its very name, a private right, not a public one") (maj. opn., *ante*, p. 28) and (2) the public policy was not firmly established at the time of her retaliatory firing. (Maj. opn., *ante*, p. 29.)

A cause of action for wrongful termination in violation of public policy is not new. Our Supreme Court in *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] explained 10 years ago that such a discharge is "wrongful" because the employer has a duty implied in law to conduct its affairs in compliance with fundamental principles of public policy. What the court made plain was that to recover for tortious discharge an employee must plead and prove that he or she was discharged for a reason contravening fundamental principles of public policy. That requirement was in no way diminished by the recent decision in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373]. In truth it was reinforced in that the Supreme Court there saw the issue before them precisely in such *Tameny* terms and said so. "Regardless of whether the existence of a statutory or constitutional link is required under *Tameny*, disparagement of a basic *public* policy must be alleged, and we turn now to determining whether plaintiff has done so here." (*Id.* at p. 669.)

The Supreme Court in *Foley* emphasized *Tameny*'s insistence that the public policy basis for the cause of action must be firmly established, fundamental and substantial. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 670, fn. 11.) Applying that test it found no substantial public policy which prohibits an employer from discharging an employee for reporting information to the employer relevant to the employer's interest. Because it determined that the duty of an employee to disclose information to his employer serves only the private interest of the employer, it held that "the rationale underlying the *Tameny* cause of action is not implicated." (*Id.* at p. 671.) In layman's terms there was no public policy involved.

In the instant case Barbara Luck thought she located the public policy right at the start of this state's basic document which reads: "PREAMBLE. We, the People of the State of California, grateful to Almighty God for our freedom, in order to secure and perpetuate its blessings, do establish this Constitution. ARTICLE I. DECLARATION OF RIGHTS. § 1. All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

Unlike the majority I find the public policy basis for Barbara Luck's cause of action right where she finds it, and I find it to be firmly established, fundamental and substantial. What could be more firmly established than the very first section of the first article of the state Constitution? What could be more fundamental than that document's enumeration of inalienable rights? What could be more substantial than "enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy"? Having met the requirements of *Tameny* and *Foley*, she has stated and proved her cause of action.

The analysis of the majority is doubly flawed. It applies an inappropriate test to the wrong policy and therefore reaches the wrong result. The majority apply the tests set out in *Foley* without regard to the fundamental distinction that this case involves public policy derived from a personal, constitutional right and not public policy as reflected in a criminal or regulatory statute.

To illustrate the type of conduct which "inures to the benefit of the public at large rather than to a particular employer or employee," *Foley* looked at cases in which the employer sought to compel an employee to engage in illegal conduct by unlawfully fixing prices (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167, 170) or by committing perjury before a legislative committee. (*Petermann* v. *International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188-189 [44 P.2d 25].) In addition the opinion notes

with apparent approval instances where the tort arose because an employee was fired for disclosing illegal conduct either by reporting criminal activity (*Garibaldi* v. *Lucky Food Stores, Inc.* (9th Cir. 1984) 726 F.2d 1367, 1374; *Palmateer* v. *International Harvester Co.* (1981) 85 Ill.2d 124 [421 N.E.2d 876, 879-880]) or by objecting to unsafe working conditions (*Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015]; *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at 670).

These cases, as the majority read *Foley*, define the outer limits of the universe of conduct which can give rise to the tort of wrongful discharge in violation of public policy. Such a reading means that the cause of action will not be available if the public policy is protective of a purely personal right.

Employer violations of personal rights will virtually never[1] yield a cause of action for the injured employee because violations of personal rights cannot survive the void-if-they-had-contracted-for-it test suggested in a *Foley* footnote (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at pp. 670-671, fn. 12) and applied by the majority. Nothing in the *Foley* decision suggests that the voidness test has any applicability to evaluating a public policy with a constitutional source. In contrast to the situation at hand which involves inalienable rights specifically set forth in the Constitution, *Foley* arose out of the assertion of, what Chief Justice Lucas most charitably referred to as, a "statutory touchstone" which appellant argued gave rise to a duty to report information to the employer. (*Id.* at p. 669.) The court found it "unclear" whether the "alleged duty is one founded in statute" (*id.* at p. 670), but went forth to decide the case "[w]hether or not there is a statutory duty." (*Ibid.*) In doing so the court referred to the difficulty of finding substantial public policy reflected in statutes by explaining that ". . . many statutes simply regulate conduct between private individuals, *or impose requirements whose fulfillment does not implicate fundamental public policy concerns.* " (*Id.* at p. 669, italics added.) It hardly can be said with a straight face that the declaration of rights contained in article I, section 1 of the Constitution imposes requirements whose fulfillment does not implicate fundamental public policy concerns.

Since it is the task of constitutions by their very nature to enunciate high public policy rather than to simply regulate conduct between private individuals, it makes no sense to apply to such documents—particularly to a bill of rights—any test designed to determine whether a statute sets forth public policy. Nothing whatsoever on the face of the *Foley* decision requires such an unusual determination, and since this court has an obligation to construe

---

[1] Presumably a contract to enslave would sufficiently offend public policy to be void. (Cal. Const., art. I, § 6.)

Supreme Court decisions so as not to reach an absurd result, I would not apply the test suggested in footnote 12 of *Foley* to the Constitution of the State of California.

Unless we accept the perfectly logical and defensible position that inalienable personal rights inure by their very nature to the benefit of all Californians and thus to the public benefit, we accord no practical protection to the very rights given the greatest deference by our Constitution. The bizarre outcome of the majority's reasoning is evident here. Barbara Luck has, they acknowledge, an inalienable right to be free from an involuntary intrusion into her privacy by her employer's demand she submit to urinalysis. Had her employer not fired her for refusing the test, she presumably could have obtained injunctive relief from the testing. However, because her employer immediately fired her for insubordination before she could seek such judicial vindication of her rights she is deprived of her job *and* of any tortious claim for the employer's conduct.[2]

My second objection to the majority's reasoning is that they incorrectly identify the public policy interest as a "policy prohibiting urinalysis." (Maj. opn., *ante*, p. 29.) The policy at issue is not urinalysis, but the preservation of personal privacy.

In *Foley* the Supreme Court made it clear that the policy we look to in search of public interest is the source of the duty implied in law upon the employer. (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 666.) Here the duty derives from article I, section 1 of the California Constitution. Had Luck instead relied on a public policy embodied in a statute prohibiting involuntary physical testing of employees then the issue of whether such a hypothetical statute in 1985 prohibited urinalysis would be relevant. She did not. Californians acknowledged their privacy right by amending our Constitution to include privacy in 1974, some 11 years before Luck's firing. The policy protecting privacy embodied in that amendment, both temporally and philosophically, was firmly established, fundamental, substantial and clearly mandated long before Luck was fired.

The limits the majority impose upon a public policy based wrongful discharge are inconsistent both with basic human dignity and with our Supreme Court's decisions. Without acknowledging that they do so the

---

[2] In the recently decided case of *Semore* v. *Pool* (1990) 217 Cal.App.3d 1087, 1098 [266 Cal.Rptr. 280], the majority similarly conclude that the privacy interests of an employee terminated for refusing a compelled drug test implicate a fundamental public policy. As they note, "privacy, like the other inalienable rights listed first in our Constitution, is at least as fundamental as the antitrust statutes in *Tameny* or the perjury statutes in *Petermann.*" (*Id.* at p. 1096.)

majority seek a return to an era of masters and servants. As Justice Tobriner reminded us in *Tameny* modern notions of employer-employee relations were "enunciated by this court more than 35 years ago, [when it noted] that '[t]he days when a servant was practically the slave of his master have long since passed.' [Citation.]" (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at p. 178.)

For these reasons I would affirm the judgment below on the ground that Barbara Luck proved a cause of action for wrongful discharge in violation of public policy. Further, I join only in the resolution of the punitive damages issue (part V, section A [unpublished portion of the majority opinion]), without adopting the analysis set forth therein.[3*] In all other respects I concur in the majority opinion.

A petition for a rehearing was denied March 23, 1990, and the opinion was modified to read as printed above. The petition of appellant Southern Pacific Transportation Company for review by the Supreme Court was denied May 31, 1990.

---

* See footnote, *ante,* p. 1.